[No. 60389-8. En Banc.]

Argued June 28, 1995.     Decided August 29, 1996.

THE STATE OF WASHINGTON, *Respondent*, v. AMY E.
LIVELY, *Appellant*.

*Amy E. Lively,* pro se.

*John G. Ziegler;* and *William D. McCool,* for appellant.

*James L. Nagle, Prosecuting Attorney* for Walla Walla County, and *James R. Reierson, Deputy; Russell D. Hauge, Prosecuting Attorney* for Kitsap County, and *Pamela B. Loginsky, Deputy,* for respondent.

MADSEN, J. — At issue in this case is whether: (1) the trial court erred in instructing the jury as to the burden of proof for the defense of entrapment; (2) the evidence supports a finding, as a matter of law, that the Defendant was entrapped; and (3) the actions of the State constitute outrageous conduct in violation of the Defendant's right to due process. On direct review, we reverse the Defendant's conviction.

## FACTS

This case arises from an undercover drug investigation in Walla Walla assisted by a police informant, Kamlesh

"Koby" Desai. On June 6, 1991, Desai phoned a drug unit detective to arrange a delivery of cocaine from the Defendant, Amy Lively. The detective arrived at Desai's residence at about 3:00 p.m. and gave the Defendant $70. She left in Desai's automobile and returned in 15 minutes. She told the detective, whom she knew as Rick, a friend of Desai, that she would have the cocaine for him later that day. The detective left and, after receiving a call from Desai, returned to Desai's apartment three hours later. At that time, the Defendant delivered a packet of cocaine weighing 1.3 grams to the detective.

On June 17, 1991, the same detective, along with another member of the drug unit, responded to a telephone call from Desai arranging another delivery of cocaine. They arrived at Desai's apartment at 8:30 p.m. The purchase price was $85 because the Defendant was using a different source. One detective handed her the money and she left in Desai's car. The Defendant called to say her connection would be delayed. She did not return until after midnight.

The detectives testified that when she returned, the Defendant was upset and initially said she did not have the cocaine or the money. After one of the detectives claimed she was trying to steal his money, she went into the kitchen, retrieved a packet of cocaine weighing .9 grams and handed it to him. The detectives stated she then indicated she wanted to get high and have sex with one of them. In addition, she wanted $10 for her troubles and the detective gave her the money. The Defendant denied saying she wanted to get high or have sex with the detective. She also stated she did not profit from the sales. She admitted receiving the $10, but stated the money was to be used to put gas in Desai's car.

The Defendant was charged with two counts of delivery of a controlled substance. At her trial in November 1992, she did not dispute the two deliveries of cocaine, but claimed a defense of entrapment. In support of that defense, the Defendant testified that by the time she was

14 years old she was drinking alcohol and using cocaine. She stopped using cocaine at 15 when she learned she was pregnant. At age 18, she was raising two children and her husband was stationed in Korea. She began drinking alcohol heavily. After attempting alcohol withdrawal on her own, she admitted herself into a detoxification program at St. Mary's Medical Center. Immediately following the program she began attending Alcoholics Anonymous/Narcotics Anonymous (AA/NA) meetings. In March 1991, she had an alcoholic relapse and entered a 28-day inpatient detoxification program at Walla Walla General Hospital. Prior to meeting Desai, the Defendant testified that she had never sold or offered to sell drugs. She has never been arrested or convicted of any crime other than the charges for delivery of cocaine in June 1991. She also testified that she was not using drugs at the time of the offenses and had not used cocaine since her first pregnancy.

Further, the Defendant established that early in 1991, Desai began working as a police informant employed by the Walla Walla City/County Drug Unit. He was relocated from LaGrande, Oregon, where he also had operated as an informant. Desai was provided with an apartment, including utilities, a car, and other living expenses, in exchange for his work as an informant. He signed a contract with the drug unit which required that he not break any criminal laws, not use narcotics, and stay in daily communication with the drug unit. The detectives were in contact with Desai as many as six to twelve times a day to check on his progress.

Desai began attending AA/NA meetings with the knowledge and approval of the detectives from the drug unit. He attended these meetings in order to identify repeat drug addicts continuing to sell illegal drugs.

The Defendant met Desai at an AA/NA meeting in mid-April 1991, following her completion of the inpatient hospital program. She tried to kill herself after completing the program and remained emotionally distraught.

She testified that Desai asked her out on a date about two weeks after they met. She maintained the relationship because he was very supportive and responsive to her emotional needs.

According to the Defendant, she and Desai began a sexual relationship in May 1991, and she moved in with him for two months. She also testified that in late June, Desai proposed marriage. Three defense witnesses testified that in early July 1991, Desai and the Defendant spoke of their plans to marry, of his assistance to her in obtaining a divorce, and of his offer to fly her friends to California for the wedding. From the testimony, it is clear the Defendant lived with Desai around the time the offenses occurred. A defense witness testified that the two lived together in the summer of 1991 until early July. Desai and one of the detectives testified that the Defendant stayed with Desai for three weeks. The detective testified that this living arrangement occurred when the Defendant was going through a divorce and Desai stated that at the time she was still a suspect. He also testified that the detectives approved the living arrangement. However, both detectives testified they did not approve and advised Desai not to develop a close personal relationship with the Defendant.

The Defendant testified that about four to six weeks after she met Desai, he said he had a very good friend who wanted to buy cocaine and asked if she had a connection. She stated that Desai asked her to get drugs for Rick (the detective) repeatedly each day for two weeks before she agreed to purchase cocaine and she did so only because she was emotionally reliant on Desai.

Desai, who was called only as a rebuttal witness for the prosecution, disagreed with much of the Defendant's testimony. He stated that she was the first to discuss drugs by mentioning she had a connection and could get marijuana and cocaine. In response to a specific question, he denied asking her to obtain cocaine for his friend Rick a dozen times a day for two weeks. He testified that they

never dated and never had a sexual relationship. He admitted, however, allowing her to stay at his apartment, but said that she used a separate bedroom during her stay. He also admitted that marriage was discussed, but testified that he never proposed to her and that she initiated the discussion. Desai told the detectives that when the Defendant discussed marriage plans he thought it was a joke. He denied offering to assist her in obtaining a divorce. He also testified that he saw her use cocaine on three separate occasions.

Desai admitted lying repeatedly about his background in a deposition taken by the defense. He stated that he thought it was all right to do so to maintain his cover story and said he did not believe he was under oath during the deposition.

Based on the State's conduct in this case, the Defendant proposed instructing the jury that the absence of entrapment is an element of the offense of delivery of a controlled substance which the State must prove beyond a reasonable doubt. The court disagreed and instructed the jury that the Defendant had to prove the existence of entrapment by a preponderance of the evidence. Prior to closing argument, and instruction of the jury, the Defendant moved for a directed verdict contending that no rational trier of fact could find that she had failed to prove she was entrapped. The court also denied this motion.

Following a verdict of guilty on both counts of delivery of cocaine, the defense filed motions for arrest of judgment and for a new trial. These motions were denied. On March 24, 1993, the trial court sentenced the Defendant to 13 months, an exceptional sentence below the standard range. The Defendant was granted direct review in this court. The State did not appeal the exceptional sentence.

I

In challenging her conviction, the Defendant first

contends that the trial court erred because the jury instructions required her to prove the defense of entrapment by a preponderance of the evidence and failed to require the State to prove beyond a reasonable doubt that she was not entrapped.

This court has long recognized the existence of the common law defense of entrapment which occurs where:

> the accused is lured or induced by an officer of the law or some other person, a decoy or informer, to commit a crime which he had no intention of committing. Such defense is not available where the criminal intent originates in the mind of the accused and the police officers, through decoys and informers, merely afford the accused an opportunity to commit the offense. *State v. Littooy*, 52 Wash. 87, 100 Pac. 170; *State v. Ragan*, 157 Wash. 130, 288 Pac. 218; *Seattle v. Gleiser*, 29 Wn.2d 869, 189 P.2d 967.

*State v. Moore*, 69 Wn.2d 206, 208, 417 P.2d 859 (1966).

In 1975, the Washington Legislature adopted a statutory definition of entrapment which provides:

> (1) In any prosecution for a crime, it is a defense that:
>
> (a) The criminal design originated in the mind of law enforcement officials, or any person acting under their direction, and
>
> (b) The actor was lured or induced to commit a crime which the actor had not otherwise intended to commit.
>
> (2) The defense of entrapment is not established by a showing only that law enforcement officials merely afforded the actor an opportunity to commit a crime.[1]

RCW 9A.16.070.

The statute codified the common law definition of entrapment. Under RCW 9A.16.070, and common law, entrapment occurs when the crime originates in the mind of the police or an informant and the defendant is induced to commit a crime which he was not predisposed to com-

---

[1]This statutory definition of entrapment has not been amended since its adoption in 1975.

10

mit. *State v. Smith,* 101 Wn.2d 36, 42, 677 P.2d 100 (1984). The statute thus constitutes a restatement of the subjective test of entrapment as applied by both the federal and Washington State courts.[2] *See Sorrells v. United States,* 287 U.S. 435, 451, 53 S. Ct. 210, 77 L. Ed. 413, 86 A.L.R. 249 (1932); *State v. Waggoner,* 80 Wn.2d 7, 10, 490 P.2d 1308 (1971). *See also* 21 AM. JUR. 2D *Criminal Law* § 202, at 365 (1981). The defendant must "demonstrate that he was tricked or induced into committing the crime by acts of trickery by law enforcement agents. Second, he must demonstrate that he would not otherwise have committed the crime." *Smith,* 101 Wn.2d at 43. While the court in *Smith* placed a burden of production on the defendant claiming the defense of entrapment, the question of which party had the burden of persuasion was not at issue before that court and is a question of first impression.

The Defendant concedes that she has the burden of producing evidence of the affirmative defense of entrapment, but only to the extent necessary to create a reasonable doubt of guilt. Once she has produced sufficient evidence, she argues that the State has the burden of persuading the jury beyond a reasonable doubt that the Defendant was not entrapped. In support of this argument, the Defendant relies on the statutory construction analysis discussed in *State v. McCullum,* 98 Wn.2d 484, 656 P.2d 1064 (1983) and *State v. Acosta,* 101 Wn.2d 612, 683 P.2d 1069 (1984).

■■ *McCullum* and *Acosta* provide a two-tiered test to evaluate whether the State or a defendant has the ultimate burden of persuasion. First, the court must determine whether the defense is an element of the crime or whether the defense negates an element of the crime.

---

[2]The subjective test focuses on the issue of whether the defendant was predisposed to commit the crime. The objective approach focuses on the conduct of the State to induce or entice the defendant, rather than the predisposition of the defendant. For a discussion of the two approaches *see* John H. Derrick, Annotation, *Burden of Proof As To Entrapment Defense-State Cases,* 52 A.L.R.4TH 775 (1987), which notes that most states, including Washington, have adopted the subjective approach. *See also* WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 5.2(f)(4) (1986).

Under the due process provisions of the Fifth and Fourteenth Amendments of the United States Constitution, the State must prove every element of an offense beyond a reasonable doubt. If a statute indicates an intent to include absence of a defense as an element of the offense, or the defense negates one or more elements of the offense, the State has a constitutional burden to prove the absence of the defense beyond a reasonable doubt. *McCullum*, 98 Wn.2d at 490; *Acosta*, 101 Wn.2d at 615; *see also Patterson v. New York*, 432 U.S. 197, 214-15, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977).

Second, if there is no due process requirement, the court must determine whether the Legislature intended, nevertheless, to place the ultimate burden of persuasion on the State to prove the absence of the defense beyond a reasonable doubt. If the statute does not expressly assign the burden to either the State or the defendant, and provides no indication of the Legislature's intent to overrule common law, the statute will be presumed to follow judicial precedent. *McCullum*, 98 Wn.2d at 493; *see also State v. Calderon*, 102 Wn.2d 348, 351, 684 P.2d 1293 (1984).

Turning to the first consideration of the *McCullum/Acosta* test we conclude that there is no due process requirement that the State prove the affirmative defense of entrapment beyond a reasonable doubt because it is not an element of the crime nor does it negate an element of the crime. *State v. Casbeer*, 48 Wn. App. 539, 740 P.2d 335, *review denied*, 109 Wn.2d 1008 (1987). The defense of entrapment is not of constitutional dimension. *United States v. Russell*, 411 U.S. 423, 433, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973).

As to the second inquiry, RCW 9A.16.070 does not specify whether the defendant or the State has the ultimate burden of persuasion to prove or disprove the entrapment defense. Under the *McCullum/Acosta* test, legislation is not intended to change the burden of proof established under common law, unless specified in the statute. Thus, it is necessary to review the common law to determine who carries the burden of proof on this defense.

Three years after RCW 9A.16.070 was adopted, the court of appeals examined the entrapment defense and recognized a long-standing rule that defendants be held responsible for proving their affirmative defenses. *State v. Ziegler*, 19 Wn. App. 119, 575 P.2d. 723 (1978). However, the defendant was not required to "persuade the jury beyond a reasonable doubt or by a preponderance of the evidence." *Id.* at 122. Rather, the defendant must produce evidence "sufficient to create a reasonable doubt of guilt in the minds of the jury." *Id.* at 122. *Ziegler* relied on an earlier case which held that a defendant's burden of proving the defense of duress "need only be established to the extent of creating a reasonable doubt in the minds of the jurors as to the guilt of the one accused of the crime charged." *State v. Bromley*, 72 Wn.2d 150, 155, 432 P.2d 568 (1967).

This court observed more recently that duress is an affirmative defense and that affirmative defenses normally "must be proved [by the defendant] by a preponderance of the evidence." *State v. Riker*, 123 Wn.2d 351, 367, 869 P.2d 43 (1994). Calling the *Bromley* decision perplexing and confusing, the court concluded that the only logical reading of *Bromley* is to require the defendant to prove the affirmative defense of duress by a preponderance of the evidence. *Id.* at 368-69. The *Riker* decision placed the ultimate burden of persuasion on the defendant claiming duress and determined that the appropriate quantum of proof required is a preponderance of the evidence. *Riker* has since been extended to the defense of entrapment. *State v. Chapin*, 75 Wn. App. 460, 471, 879 P.2d 300 (1994), *review denied*, 125 Wn.2d 1024 (1995); *State v. Trujillo*, 75 Wn. App. 913, 917, 883 P.2d 329 (1994), *review denied*, 126 Wn.2d 1008 (1995).

■ The question before this court is whether defendants who claim the entrapment defense should be held to the same burden of persuasion as other affirmative defenses, such as duress, or whether there is some reason to distinguish entrapment and require the State to prove the

absence of entrapment beyond a reasonable doubt. As the Defendant has noted, many jurisdictions that apply the subjective standard for entrapment place the burden of persuasion on the government to disprove entrapment beyond a reasonable doubt.[3] Under federal common law, the State ultimately has the burden of proving beyond a reasonable doubt that the defendant was "disposed to commit the criminal act prior to first being approached by Government agents." *Jacobson v. United States*, 503 U.S. 540, 549, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992). In Washington, however, defendants are required to prove affirmative defenses by a preponderance of the evidence "because generally, affirmative defenses are uniquely within the defendant's knowledge and ability to establish." *Riker,* 123 Wn.2d at 367 (quoting *State v. Knapp,* 54 Wn. App. 314, 320-22, 773 P.2d 134, *review denied,* 113 Wn.2d 1022 (1989)).

■ While it is true that in cases involving entrapment the State's action is integrally involved, predisposition of the defendant is the focal element of the defense. The defendant has the knowledge and ability to establish whether he or she was predisposed to commit the crime; whether he or she was lured or induced to do so by the State; and whether the criminal design originated in the mind of the police or an informant. There is no reason to distinguish the affirmative defense of entrapment from that of other affirmative defenses. Defendants should ultimately be responsible for demonstrating that they were improperly induced to commit a criminal act which they otherwise would not have committed. We find that the trial court did not err in instructing the jury in this case that the Defendant was required to prove the defense of entrapment by a preponderance of the evidence.

■ ■ The Defendant also argues that because RCW

---

[3]Many states which have adopted the subjective test require the state to prove the absence of entrapment beyond a reasonable doubt. John H. Derrick, Annotation, *Burden of Proof As To Entrapment Defense-State Cases,* 52 A.L.R.4TH 775 (1987); *see also* WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 5.2(f)(4) (1986).

9A.16.070 is silent on the burden of proof, under the rule of lenity the statute should be interpreted to require the State to prove the absence of entrapment beyond a reasonable doubt. We disagree. The rule of lenity provides that where an ambiguous statute has two possible interpretations, the statute is to be strictly construed in favor of the defendant. *State v. Gore*, 101 Wn.2d 481, 486, 681 P.2d 227, 39 A.L.R.4th 975 (1984); *State v. Sass*, 94 Wn.2d 721, 726, 620 P.2d 79 (1980). This rule is inapplicable in the present case because there is no ambiguity. There are not two interpretations of a statute where the statute is silent on the matter at issue.

We also find unpersuasive the Defendant's argument that upholding the trial court's jury instruction would be an unforeseeable judicial enlargement of a criminal statute. This principle is similar to the ex post facto restriction on legislative adoption of statutes. An unforeseeable judicial enlargement of a criminal statute may only be applied prospectively under the due process clause of the Fourteenth Amendment. *Bouie v. City of Columbia*, 378 U.S. 347, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964). "[W]here a court overrules a prior decision so as to enlarge the scope of criminal liability, the new rule must be applied prospectively only." *Gore*, 101 Wn.2d at 489. The decision we reach today does not require this court to overrule or modify any prior decision. The Defendant had the burden of production of evidence under *Smith*. As neither the Legislature nor this court has directly addressed the question of the burden of persuasion for this defense, it cannot be argued that placing the burden on the Defendant is an unforeseeable enlargement of a criminal statute.

## II

The Defendant next argues that her conviction should be reversed because the evidence presented was insufficient to support a finding that she was not entrapped. Following submission of the evidence to the jury, and prior

to closing argument, the Defendant moved for a directed verdict of acquittal on the ground that no trier of fact could find that she had not proven her entrapment defense. This motion was denied. Following the jury verdict, she moved for dismissal based on insufficiency of the evidence to prove material element of the crime, i.e., that she was not entrapped. This motion also was denied. The question before this court is whether, as a matter of law, there was sufficient evidence to submit this case to the jury and whether the evidence in this case was sufficient to support the jury's verdict.

As part of her sufficiency argument, the Defendant requests this court to find that the trial court's findings of fact and conclusions of law in support of the exceptional sentence constitute an acquittal, as a matter of law. Judge Reser made the following findings of facts in support of the exceptional sentence:

1. The defendant Amy Lively has no criminal history prior to the events of this case.

2. The defendant had previously had a cocaine problem and had attended an inpatient treatment program in an attempt to eliminate that problem.

3. The State's confidential informant, Kamlesh Desai met the defendant at an NA meeting. Desai is a clever, deceitful person, having passed approximately 30 bad checks. The informant lied in court and showed no remorse.

4. Prior to the alleged incidents herein the defendant and the State's confidential informant lived together.

5. The State's confidential informant requested the defendant to obtain cocaine for him on a number of occasions.

6. The defendant did not seek anyone to whom to sell cocaine, but was sought out. The two deliveries were made at the request of Desai and were 1 gram each.

7. After the deliveries herein, The State's confidential informant asked the defendant to marry him.

8. The defendant would be subject to a clearly excessive sentence in the light of the purpose of chapter 9.94A.

10. The court finds as fact that the defendant, with no apparent predisposition to do so, was induced by others specifically Kamlesh Desai to participate in the crime of delivery of a controlled substance.

Clerk's Papers at 146-47.

■ The Defendant argues that the mitigating factors listed above in effect result in a finding of entrapment, as a matter of law, by the trial court. This court will not conclude, however, that mitigating factors used to justify an exceptional sentence may be considered in evaluating whether there was sufficient evidence to submit an issue to a jury. Such a finding would result in a reluctance of courts to examine mitigating circumstances which justify exceptional sentences. Moreover, the trial court may not substitute its own evaluation of the evidence for that of the jury where the court has denied a motion to dismiss based on the insufficiency of the evidence.

■ Rather, we evaluate a sufficiency of the evidence argument on the trial record. Before examining that record, however, we must determine what standard of review to apply. To support her sufficiency argument, the Defendant cited federal entrapment cases in which the courts held that entrapment was established as a matter of law after reviewing the record. *Sherman v. United States*, 356 U.S. 369, 78 S. Ct. 819, 2 L. Ed. 2d 848 (1958); *Jacobson v. United States*, 503 U.S. 540, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992). These cases, however, are of little help in determining what standard of review should be applied in deciding whether the trial court erred in allowing this case to go to the jury since Washington, unlike federal law, places the burden on the defendant claiming the affirmative defense. The State argues that the evidence, when viewed in the light most favorable to the prosecution, is sufficient to support the verdict if "any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992); *see also State v. Green*, 94 Wn.2d 216, 616

P.2d 628 (1980). This standard of review only applies, however, if the State has the burden of proving the absence of entrapment beyond a reasonable doubt. Since we have determined the trial court properly instructed the jury that the Defendant had the burden of proving entrapment by a preponderance of the evidence, we must look elsewhere for an appropriate standard of review.

Other jurisdictions have examined the standard of review for sufficiency of the evidence when a defendant is required to prove an affirmative defense by a preponderance of the evidence. The appropriate standard of review in such cases is whether, considering the evidence in the light most favorable to the State, a rational trier of fact could have found that the defendant failed to prove the defense by a preponderance of the evidence. *Wilson v. State*, 257 Ga. 444, 359 S.E.2d 891 (1987) (challenge of a conviction based on the affirmative defense of insanity); *State v. Roy*, 395 So. 2d 664 (La. 1981) (insanity defense); *State v. Bell*, 647 So. 2d 498, 500 (La. App. 1994) (the defense of reasonable discipline of a child). We are persuaded that this test provides the appropriate means of reviewing the sufficiency of evidence relating to an affirmative defense.

In reviewing the evidence in the light most favorable to the State, we note that the detectives in this case testified that the Defendant demonstrated no reluctance in carrying out the drug transactions. One of the detectives testified that she told him she wanted to get high and have sex with him and that she wanted money for her role in the drug transactions. Desai testified that the Defendant had offered to buy the drugs and that he did not initiate the transactions. Further, he testified that he was not involved in a sexual relationship with the Defendant and that he treated her discussion of marriage as a joke. The detectives also confirmed that Desai treated the talk of marriage as a joke. Desai testified that he had seen the Defendant use cocaine on three separate occasions. Finally, the Defendant purchased drugs from two different sources

and admitted that she previously had a drug problem. If believed, this testimony could convince a reasonable juror that the Defendant had contacts in the drug community because she was still involved in the use of illegal substances.

We also observe, however, that it is undisputed that the Defendant has no criminal record nor any prior involvement selling illegal narcotics. It is further undisputed that Desai met the Defendant, a recovering alcoholic in extreme emotional distress, at an AA/NA meeting which he was attending with the approval of the detectives for the sole purpose of targeting suspects. It is also undisputed that she was not a target of any drug investigation until Desai met her and developed a relationship for the purpose of making her a suspect. It is undisputed that she was staying with Desai in a state-furnished apartment and that the arrangements for each of the deliveries were made by the informant, Desai. Finally, it is undisputed that the Defendant developed an extreme emotional reliance on her relationship with Desai.

Despite this considerable evidence of entrapment, however, a review of all of the evidence presented in the light most favorable to the State leads us to conclude that a rational trier of fact could have found that the Defendant failed to prove entrapment by a preponderance of the evidence. Thus, we cannot find that the court erred in allowing the jury to resolve the entrapment issue.

### III

The Defendant next argues that the conduct of the State was so outrageous that it violated her right of due process under the Fifth and Fourteenth Amendments of the federal constitution.[4] The Defendant raised this is-

---

[4]We grant the State's motion to strike the portions of the Defendant's reply brief adding a *Gunwall* (*State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4TH 517 (1986)) analysis to her Constitutional claims for the first time. *See State v. Hudson*, 124 Wn.2d 107, 120, 874 P.2d 160 (1994); *State v. Clark*, 124 Wn.2d 90, 95 n.2, 875 P.2d 613 (1994) (court will not consider *Gunwall* analysis performed in reply brief). We also grant the motion to strike other portions of

sue for the first time in her appellate brief. However, constitutional error may be raised for the first time on appeal, particularly where the error affects "fundamental aspects of due process." *State v. Johnson*, 100 Wn.2d 607, 614, 674 P.2d 145 (1983), *overruled on other grounds by State v. Bergeron*, 105 Wn.2d 1, 711 P.2d 1000 (1985).

■ Under the subjective approach of entrapment, the focal issue is the predisposition of the defendant to commit the offense. Conversely, outrageous conduct is founded on the principle that the conduct of law enforcement officers and informants may be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973). For the police conduct to violate due process, the conduct must shock the universal sense of fairness. *Id*. at 432. Whether the State has engaged in outrageous conduct is a matter of law, not a question for the jury. *United States v. Dudden*, 65 F.3d 1461, 1466-67 (9th Cir. 1995). *See State v. Hohensee*, 650 S.W.2d 268, 272 (Mo. App. 1982) (citing federal cases).

Following *Russell*, nearly every federal circuit court and many state courts, including Washington, have recognized that the State's conduct may be so inappropriate as to violate due process. *See United States v. Harris*, 997 F.2d 812, 815 (10th Cir. 1993); *Pennsylvania v. Nelson*, 446 Pa. Super. 240, 666 A.2d 714, 719 (1995); *State v. Shannon*, 892 S.W.2d 761, 765 (Mo. App. 1995). However, as noted by both parties, no Washington decision has yet held that a defendant's due process rights have been so violated.

In determining whether police conduct violates due process, this court has held that the conduct must be so shocking that it violates fundamental fairness. *State v. Myers*, 102 Wn.2d 548, 551, 689 P.2d 38 (1984); *State v. Smith*, 93

the reply brief relating to the spiritual nature of NA/AA meetings because they were not part of the trial court record. *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 252-53, 850 P.2d 1298 (1993).

Wn.2d 329, 351, 610 P.2d 869, *cert. denied*, 449 U.S. 873 (1980). A due process claim based on outrageous conduct requires more than a mere demonstration of flagrant police conduct. *Myers*, 102 Wn.2d at 551. Public policy allows for some deceitful conduct and violation of criminal laws by the police in order to detect and eliminate criminal activity. *State v. Emerson*, 10 Wn. App. 235, 242, 517 P.2d 245 (1973). Dismissal based on outrageous conduct is reserved for only the most egregious circumstances. " 'It is not to be invoked each time the government acts deceptively[.]' " *United States v. Sneed*, 34 F.3d 1570, 1577 (10th Cir. 1994) (quoting *United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992)); *see also State v. Pleasant*, 38 Wn. App. 78, 83, 684 P.2d 761, *review denied*, 103 Wn.2d 1006 (1984).

This court relied on the plurality decision in *Hampton v. United States*, 425 U.S. 484, 96 S. Ct. 1646, 48 L. Ed. 2d 113 (1976) and said that a due process violation requires a showing that the State's conduct "violates a specific constitutional right of the defendant." *Myers*, 102 Wn.2d at 551. We take this opportunity to disavow this language, however. In Hampton, only three justices signed the majority opinion which stated in dicta that the "limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the *defendant*." *Hampton*, 425 U.S. at 490. Two other justices concurred in the judgment only. Three justices dissented.

Following the *Hampton* decision, courts have continued to recognize the rights of defendants to claim a due process violation based on outrageous government conduct without requiring a separate constitutional violation. *See Sneed*, 34 F.3d at 1576; *see also United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991). To require defendants to prove a separate violation of a constitutional right effectively negates the claim of outrageous conduct. Either outrageous conduct may be raised independently of other constitutional restrictions, as we recognize here, or the defense is essentially nonexistent.

While some courts have read the United States Supreme Court decisions to limit the outrageous conduct defense to a "slim category of cases in which the police have been brutal, employing physical or psychological coercion against the defendant,"[5] other courts have not accepted this limited application of the defense. *United States v. Bogart*, 783 F.2d 1428, 1435 (9th Cir. 1986), *vacated on other grounds with respect to one defendant sub nom. United States v. Wingender*, 790 F.2d 802 (9th Cir. 1986). Also violating due process standards are those cases where the government conduct is so integrally involved in the offense that the government agents direct the crime from beginning to end, or where the crime is fabricated by the police to obtain a defendant's conviction, rather than to protect the public from criminal behavior. *Bogart*, 783 F.2d at 1436; *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971); *Commonwealth v. Matthews*, 500 A.2d 853 (Pa. Super. 1985); *Shannon*, 892 S.W.2d at 765.

■ We agree with those courts which hold that in reviewing a defense of outrageous government conduct, the court should evaluate the conduct based on the "totality of the circumstances." *United States v. Tobias*, 662 F.2d 381, 387 (1981), *cert. denied*, 457 U.S. 1108 (1982); *State v. Hohensee*, 650 S.W.2d 268 (Mo. App. 1982). Each case must be resolved on its own unique set of facts and each component of the conduct must be submitted to scrutiny bearing in mind "proper law enforcement objectives—the prevention of crime and the apprehension of violators, rather than the encouragement of and participation in sheer lawlessness." *People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78, 83 (1978); *Bo-*

---

[5]Summarizing holdings from the federal courts, the court in *Myers* observed:

It appears that the broad "fundamental fairness" guaranty is not transgressed absent "coercion, violence or brutality to the person". *See Irvine v. California*, 347 U.S. 128, 132, 133, 98 L. Ed. 561 74 S. Ct. 381 (1954) (distinguishing *Rochin v. California*, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205, 25 A.L.R.2d 1396 (1952)). *See also United States v. Kelly*, 707 F.2d 1460 (D.C. Cir. 1983), and cases cited therein.

*Myers*, 102 Wn.2d at 551.

*gart,* 783 F.2d at 1438. The government conduct may be so extensive that even a predisposed defendant may not be prosecuted based on "the ground of deprivation of due process." *Hohensee,* 650 S.W.2d at 271 (quoting *United States v. Bagnariol,* 665 F.2d 877 (9th Cir. 1981)).

In evaluating whether the State's conduct violated due process, we focus on the State's behavior and not the Defendant's predisposition. *United States v. Luttrell,* 889 F.2d 806, 811 (9th Cir. 1989). There are several factors which courts consider when determining whether police conduct offends due process: whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity (*Harris,* 997 F.2d at 816); whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation (*Isaacson,* 378 N.E.2d at 83; *Shannon,* 892 S.W.2d at 765); whether the government controls the criminal activity or simply allows for the criminal activity to occur (*United States v. Corcione,* 592 F.2d 111, 115 (2d Cir.), *cert. denied,* 440 U.S. 975 *and* 440 U.S. 985 (1979)); whether the police motive was to prevent crime or protect the public (*Isaacson,* 378 N.E.2d at 83; *Shannon,* 892 S.W.2d at 765); and whether the government conduct itself amounted to criminal activity or conduct "repugnant to a sense of justice." *Isaacson,* 378 N.E.2d at 83; *United States v. Jensen,* 69 F.3d 906, 910-11 (8th Cir. 1995), *cert. denied,* 116 S. Ct. 1571 (1996).

First, we examine whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity. When dealing with drug-related crimes, courts recognize that it is particularly necessary to allow for the use of aggressive law enforcement mechanisms, such as using paid informants to infiltrate criminal organizations and enterprises or providing contraband or other necessary items to further the criminal activity. *United States v. Simpson,* 813 F.2d 1462 (9th Cir.), *cert. denied,* 484 U.S. 898 (1987); *Harris,* 997 F.2d at 818.

In this case, the informant's attendance at AA/NA

meetings could best be described as "trolling for targets" for the police undercover operation. Desai had no information connecting the Defendant to any criminal activity. The Defendant had no criminal history. Desai did not infiltrate an ongoing criminal activity, but established a relationship with the Defendant for the purpose of instigating a crime. Had Desai attended AA/NA meetings for the purpose of befriending a person previously targeted as a suspect in an investigation, the conduct could be considered an appropriate police procedure. However, attending AA/NA meetings to lure recovering drug addicts to commit illegal acts is contrary to proper police objectives and counterproductive to the public policy of reducing the illegal drug trade through the treatment of persons with drug dependencies.

The State argues, though, that dismissal of charges is not warranted solely because the government does not have grounds for suspecting a defendant before beginning an investigation, and cites as support *United States v. Garza-Juarez*, 992 F.2d 896 (9th Cir. 1993), *cert. denied*, 114 S. Ct. 724 (1994). In *Garza-Juarez*, federal agents investigating the sale of firearms to illegal aliens at swap meets attended a swap meet where they encountered the defendant. The agents noted a number of factors that led them to conclude that the guns the defendant was selling were not his own and as a result targeted the defendant for investigation.

Identifying a recovering alcoholic as a potential suspect because of her emotional fragility and attendance at AA/NA meetings is clearly distinguishable from the police conduct in *Garza-Juarez*. The federal agents in *Garza-Juarez* were attending swap meets to investigate criminal activity, the illegal sales of firearms, at the swap meets. Conversely, there is no allegation of illegal activity occurring at AA/NA meetings nor is there any demonstration that the Defendant was in any way potentially involved in criminal activity prior to Desai's developing a relationship with her. While courts have rejected a due process viola-

tion based solely on the failure to establish reasoned grounds for investigating a suspect, such failure remains a factor which should be considered in evaluating the totality of the government's inappropriate conduct. *See Garza-Juarez*, 992 F.2d at 904; *see also United States v. Luttrell*, 923 F.2d 764 (9th Cir. 1991), *cert. denied*, 503 U.S. 959 (1992) (and the cases cited therein).

The State also argues that a defendant's criminal activity should not be excused simply because an informant met a suspect at a recognized drug treatment program and cites as support *United States v. Smith*, 924 F.2d 889 (9th Cir. 1991). In *Smith*, Todd Lofto met the defendant while both were receiving in-patient drug treatment. Lofto and the defendant had various discussions regarding the distribution of illegal drugs. Subsequently, Lofto became a police informant and targeted the defendant based on their prior conversations while in treatment. In the case before this court, the Defendant was targeted prior to any discussion regarding the sales of illegal narcotics.

■ The next factor to consider in determining whether police conduct offends due process is whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation. In this instance, the emotional reliance of the Defendant on the informant was an integral part of the informant's control. Although we have stated that the trial court's findings of fact prepared in support of an exceptional sentence cannot be considered in a sufficiency review by this court, we do not have the same concerns about relying on those findings in the context of a claimed due process violation. A violation of due process must be determined as a matter of law and it is the trial court which makes the findings of fact related to that decision. In *Bogart*, the circuit court was faced with the contention that the government's conduct was unconstitutionally impermissible, and observed that there were several factual determinations that were key to a finding of outrageous conduct. These determinations could be made only

by the district court. Since that court had made no findings regarding the factual nature of the government's conduct, the appellate court remanded for findings of fact. *Bogart*, 783 F.2d at 1434.

In this case, we have been provided with findings of fact that describe the government conduct and resolve issues of credibility. Although these findings were made for the purpose of supporting the Defendant's exceptional sentence, we see no reason why they may not now serve to support a finding of outrageous conduct. Moreover, it is important to observe that we do not rest our conclusion regarding outrageous conduct on the trial court's findings, but simply find them relevant to one of the factors considered in determining whether police conduct offends due process.

The trial court here found that the Defendant attended treatment in an effort to eliminate her drug problem; that the State's informant lived with the Defendant prior to the deliveries; that she never sought out anyone to sell drugs to; and that it was the informant who made numerous requests that the Defendant purchase drugs. The court also found that after the deliveries, the State's informant asked the Defendant to marry him and that, without apparent predisposition, the Defendant was induced by the informant, Desai, to commit the crime of delivery. These findings clearly support the conclusion that the Defendant's reluctance to commit a crime was purposely overcome by the State.

The next factor in determining whether outrageous conduct occurred is whether the government conduct controls the criminal activity or simply allows for the criminal activity to occur. A related factor is the relationship between the government conduct and the criminal offenses for which the defendant was convicted. The "more immediate the impact of the government's conduct upon the particular defendant, the more vigorously would be applied *Russell's* test for constitutional impropriety." *United States v. Spivey*, 508 F.2d 146, 150 (10th Cir.), *cert. denied*, 421 U.S. 949, 95 S. Ct. 1682, 44 L. Ed. 2d 104 (1975).

The conduct of the informant here is so closely related to the actions of the Defendant we conclude that the informant controlled the criminal activity from start to finish. The Defendant, an alcoholic in extreme distress, developed a relationship with the informant. As a result, she became emotionally reliant on him. It was the informant's "close friend," Rick, at the informant's apartment to whom the Defendant agreed to deliver cocaine because of her emotional dependence. The informant's car was used by the Defendant to obtain cocaine at times arranged by the informant, who communicated with the drug unit detectives on a daily basis. The government conduct was directly and continuously involved in the commission of the offense.

Another factor relevant to a finding of outrageous conduct is whether the police motive was to prevent further crime or protect the populace. Again, in this instance, the government conduct demonstrates a greater interest in creating crimes to prosecute than in protecting the public from further criminal behavior. *Bogart*, 783 F.2d at 1438; *United States v. Lard*, 734 F.2d 1290 (8th Cir. 1984). A recovering drug addict recently released from treatment, with no prior connection to the sale of narcotics nor any other known predisposition to commit such an offense, was actively solicited at an AA/NA meeting for the purpose of delivering cocaine.

Finally, and perhaps most importantly, is whether the government conduct amounted to criminal activity or other "improper conduct repugnant to a sense of justice." *Isaacson*, 378 N.E.2d at 83. On the record presented to this court, we find that the government's conduct was so outrageous that it shocks the universal sense of justice. Lawmakers in this State have indicated a strong preference for treatment of drug and alcohol addiction as demonstrated by the deferred prosecution law, RCW 10.05, state funding for Treatment Alternatives to Street Crime (TASC), and treatment alternatives such as community placement options in the sentencing laws, to list but a few examples.

To condone the police conduct in this case is contrary to public policy and to basic principles of human decency. The Defendant had just turned 21 and was raising two small children alone. She became addicted to cocaine and alcohol at age 14. Although she had stopped using drugs at 15, when she found she was pregnant, she continued to drink heavily. After attempting alcohol withdrawal on her own, she admitted herself into a detox program and followed up with attendance at AA/NA meetings. She relapsed, however, and thereafter entered and success-fully completed a 28-day inpatient program. Again, she sought the support of AA/NA meetings. She was emotion-ally upset, however, and attempted suicide. Within weeks of her suicide attempt she met the police informant, Desai, at an AA/NA meeting. Despite her lack of criminal history or any information connecting the Defendant to criminal conduct, she was targeted by the police infor-mant. A few weeks later she was living with the informant, who took advantage of her addiction and extreme emo-tional reliance to involve her in police sponsored drug activity.

Alcohol and drug rehabilitation programs such as AA/NA provide a life line to many of Washington's citizens recovering from problems with substance abuse. Society places a premium on rehabilitation. Peoples' ef-forts to seek help through such organizations should be commended—not result in victimization by the police and their agents. The courts of this State cannot countenance the conduct which occurred in this case. After reviewing and evaluating the totality of the conduct engaged in by the State's informant, with the knowledge of the police, we find there is no question that this conduct, as a matter of law, was so outrageous as to have violated due process principles.

We reverse the Defendant's conviction because the government conduct violated the principles of due process. Because we reverse on this ground, we need not decide whether the Defendant's constitutional right of freedom of religion was violated.

DOLLIVER, SMITH, and GUY, JJ., and PEKELIS, J. Pro Tem., concur.

DURHAM, C.J. (concurring in part, dissenting in part) — The United States Supreme Court has never overturned a criminal conviction based on the defense of outrageous government conduct. Neither has any Washington court. That is so because the threshold for proving outrageous conduct is high: it must be " '*shocking to the universal sense of justice.*' " *United States v. Russell*, 411 U.S. 423, 432, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973) (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S. Ct. 297, 4 L. Ed. 2d 268 (1960)) (emphasis added); *State v. Myers*, 102 Wn.2d 548, 551, 689 P.2d 38 (1984). The facts of this case, while disturbing, do not cross that bar.

Defendant Lively became romantically involved with a police informant whom she met at an Alcoholic Anonymous/Narcotics Anonymous meeting. Eventually, he asked her to sell drugs for him and she did. Her defense at trial was entrapment. The jury, who heard the testimony and saw the witnesses, convicted her.

The defense of outrageous conduct was raised for the first time on appeal. By reversing Lively's conviction, the majority substitutes its judgment for that of the jury. The consequences to our criminal justice system are enormous. Therefore, I dissent.

The United States Supreme Court has discussed a possible defense based on outrageous government conduct only twice. In *United States v. Russell*, 411 U.S. 423, an undercover agent for the Federal Bureau of Narcotics and Dangerous Drugs supplied the defendant with an essential ingredient used in producing methamphetamine (speed). The defendant argued that the agent's involvement "was so high that a criminal prosecution for the drug's manufacture violates the fundamental principles of due process." *Russell*, 411 U.S. at 430. The Court rejected this contention, in part because the ingredient was legal and the de-

fendant could have secured it without the agent's help. *Russell*, 411 U.S. at 431-32.

Nonetheless, Justice Rehnquist, writing for the majority, remarked that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Russell*, 411 U.S. at 431-32. He went on to explain that the behavior of law enforcement in *Russell* "stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." 411 U.S. at 432 (quoting *Kinsella*, 361 U.S. at 246). These few phrases have become the basis for the so-called doctrine of outrageous conduct. This doctrine would allow a defendant to assert a due process violation where government engages in conduct that "shocks the conscience." *See generally* Richard Lawrence Daniels, Note, *United States v. Simpson: "Outrageousness!" What Does it Really Mean? — An Examination of the Outrageous Conduct Defense*, 18 Sw. U. L. Rev. 105 (1988).

In *Hampton v. United States*, 425 U.S. 484, 96 S. Ct. 1646, 48 L. Ed. 2d 113 (1976), the United States Supreme Court revisited this issue. Justice Rehnquist, writing for a plurality, withdrew from his earlier position. He stated that a defendant who fails to prove entrapment may not in its place argue that government conduct violated due process. He concluded that "[t]he limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the *defendant.*" *Hampton*, 425 U.S. at 490. The dissent insisted that where a defendant is prevented from relying on the defense of entrapment because of a predisposition to commit the crime, he or she should nonetheless be permitted to argue that government conduct violated due process if "the conduct of law enforcement authorities is sufficiently offensive." *Hampton*, 425 U.S. at 497 (Brennan, J., dissenting). Even so, a

majority of the Supreme Court has never endorsed the outrageous conduct defense. Danny R. Veilleux, Annotation, *Actions by State Official Involving Defendant as Constituting "Outrageous" Conduct Violating Due Process Guaranties*, 18 A.L.R.5TH 1, 25 (1994).

Judge Wiggins of the Washington Court of Appeals authored a well-reasoned opinion regarding the doctrine of outrageous conduct. *State v. Rundquist*, 79 Wn. App. 786, 905 P.2d 922 (1995). He emphasized that we have never applied this doctrine to overturn a conviction.

> Washington courts have repeatedly rejected the outrageous conduct defense in cases in which police were engaged in illegal activities. Our courts have declined to find outrageous conduct where police informants engaged in acts of prostitution and attempted to recruit new prostitutes, or engaged the services of a prostitute. Our courts have also declined to find outrageous conduct where the police themselves established an elaborate operation for the purchase and sale of stolen goods or set up a phony job recruiting center and solicited the purchase of marijuana from a potential job applicant.

*Rundquist*, 79 Wn. App. at 795-96 (citations omitted).

The judiciary does not have carte blanche to define appropriate police conduct. As Judge Wiggins pointed out, the Legislature codified the entrapment defense in response to public concern over potential law enforcement abuses. Moreover,

> "[t]he execution of the federal laws under our Constitution is confined primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations."

*Rundquist*, at 796-97 (quoting *Russell*, 411 U.S. at 435). The judiciary must be circumspect as it wields its power to shape police conduct. Where police conduct violates explicit rights, such as the Fourth Amendment protection against unwarranted searches and seizures, it is highly appropriate for the judiciary to proscribe the behavior.

However, notions of "fundamental fairness" are debatable, and we should act cautiously when overturning convictions on this principle. Judge Wiggins surmised:

> Governmental misconduct must somehow impact the defendant's own rights before it rises to the level of outrageousness that will justify dismissing a prosecution. Our supreme court has repeatedly held that the court should not dismiss a criminal prosecution unless the governmental misconduct prejudices the defendant and materially affects the right to a fair trial. *Absent some violation of the defendant's own rights, the legislative and executive branches, not the judicial branch, should establish the parameters of acceptable police investigation and the extent to which the police may themselves violate the law in order to detect and prevent crime.*
>
> Assuming without deciding that the due process clause incorporates some doctrine of outrageous conduct by governmental agents separate and apart from the entrapment defense, we hold that the doctrine must be sparingly applied and used *only in the most egregious situations.*

*Rundquist*, at 797 (citation omitted; emphasis added).

The majority completely overlooks *Rundquist* and, in doing so, concocts a five-part test to determine if police conduct is so outrageous as to require reversal of a conviction based on a violation of due process. Majority, at 22. While the majority relies on *United States v. Harris*, 997 F.2d 812 (10th Cir. 1993), *State v. Shannon*, 892 S.W.2d 761 (Mo. Ct. App. 1995), *United States v. Corcione*, 592 F.2d 111 (2d Cir.), *cert. denied*, 440 U.S. 975 *and* 440 U.S. 985 (1979), *United States v. Jensen*, 69 F.3d 906 (8th Cir. 1995), *cert. denied*, 116 S. Ct. 1571 (1996), and *People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978) to further its analysis, it fails to discuss these cases in any detail. This omission probably stems from the fact that these cases lend little or no support for the majority's five-part test. In fact, these cases by and large *reject* the outrageous conduct defense. The Tenth Circuit in *Harris* found *no* outrageous conduct where law enforcement compensated the defendant, a drug addict, with

cocaine instead of cash for participation in drug transactions. *Harris*, 997 F.2d at 818. In *Shannon*, the court *rejected* the outrageous conduct defense even though police furnished the defendant with money to purchase illicit drugs, provided him with transportation to facilitate the transaction, suggested he negotiate a lower price, and permitted him to sample the drugs in exchange for successfully obtaining them. *Shannon*, 892 S.W.2d at 766. In *Corcione*, Drug Enforcement Administration agents transported heroin into the United States to assist a drug transaction. The Second Circuit characterized this as "an example of effective law enforcement work," and found *no* due process violation. *Corcione*, 592 F.2d at 115. And, in *Jensen*, the Eighth Circuit found *no* outrageous government conduct where an IRS agent told the defendant, a car salesman, that he would be purchasing a vehicle with illegal drug money. *Jensen*, 69 F.3d at 910.

As for the decision of the New York Court of Appeals, that case rests on a faulty interpretation of due process rights. In *Isaacson*, police brutally beat an *informant* and deceived him into thinking he would face a stiff prison sentence if he did not engage in a drug buy with the defendant. On the basis of this and other facts,[6] the Court found police had violated *defendant's* due process rights. *Isaacson*, 378 N.E.2d at 84-85. *Isaacson* stands for the novel proposition that a defendant can assert an *informant's* due process rights when challenging his or her own conviction. This argument has no foundation in either the Due Process Clause or in any other provision of the Constitution. By following *Isaacson*, the majority necessarily adopts the view that a defendant can challenge a conviction whenever police allegedly mistreat an informant. Due process rights are personal, and in such situations the *informant*, and not the defendant, should assert them.

---

[6]For example, the informant, with the help of police, then tricked the defendant into unwittingly crossing the border from Pennsylvania so that the sale of the controlled substance would take place in New York. *Isaacson*, 378 N.E.2d at 84.

Even if this court were to accept an outrageous conduct defense, the facts of this case do not demonstrate "the most egregious situation." *Rundquist*, 79 Wn. App. at 797. First, the jury squarely rejected Lively's entrapment defense. In discussing the entrapment defense, the majority holds there is sufficient evidence to support the jury verdict and admits that such a verdict would not be sustainable if Lively had lacked a predisposition to sell drugs. *See* majority at 9, 10. Conversely, in its discussion of the outrageous conduct defense, the majority argues that Lively had *no* predisposition to commit the crime. Majority at 26. This inconsistency is inexplicable, and suggests the majority's analysis is purely result-driven. As Justice Rehnquist indicated in *Hampton*, it makes no sense that a defendant should succeed in showing outrageous conduct where he or she failed to prove entrapment. *Hampton*, 425 U.S. at 490. By reversing Lively's conviction on the basis of the outrageous conduct defense, the majority necessarily anoints itself factfinder while usurping the role of the jury. This simply is not the function of an appellate court.

Second, the police investigation in this case was entirely on the level. While the majority states the police commenced their investigation "to *lure* recovering drug addicts," majority at 23 (emphasis added), and that "there is no allegation of illegal activity occurring at AA/NA meetings," majority at 23, these characterizations are not born out in the record. The record establishes that police had information regarding "repeaters" who both used and sold drugs while attending Alcoholics Anonymous/ Narcotics Anonymous meetings. Given this, it is not "shocking" that an investigation would ensue. The majority, however, makes much of the fact that Lively became emotionally involved with the informant, as if this amounts to outrageous conduct on the part of police. An affair with a paid informant simply does not rise to the level of fundamental unfairness "shocking to the universal sense of justice."

Moreover, unlike the facts of the cases the majority

cites, *see, e.g., People v. Isaacson*, 44 N.Y.2d 511, the police here had limited knowledge of the informant's activities. While the majority, in an attempt to find outrageous conduct on the part of police, characterizes the Defendant's relationship with the informant as one of "emotion[al] relian[ce]" and "emotional dependence," majority at 26, police testified at trial that they had very little information regarding the nature of the informant's relationship with the Defendant. Report of Proceedings at 20-21. Thus, even if Lively was emotionally involved with the informant, this is no reason to find police misconduct.

The trial court in *Lively* acted appropriately. Following a jury conviction for delivery of cocaine, the trial court acknowledged that mitigating circumstances existed, and thus departed downward from the standard sentencing range. It did not dismiss the prosecution, as the majority would have trial courts do after today's decision.

The majority has haphazardly created a test for evaluating police conduct based on a tenuous interpretation of due process rights. Our courts previously have rejected the outrageous conduct defense. Moreover, the decisions of the United States Supreme Court do not support the majority's position. While I agree with the majority that the Defendant in this case failed to prove entrapment, I must dissent as to its analysis of the doctrine of outrageous conduct.

JOHNSON, ALEXANDER, and TALMADGE, JJ., concur with DURHAM, C.J.