IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 81366-8-I |
| Respondent, | DIVISION ONE |
| v. | |
| STEVEN ALLEN PEMBERTON, | UNPUBLISHED OPINION |
| Appellant. | |

CHUN, J. — The Washington State Patrol's Missing and Exploited Children Task Force (MECTF) posted an advertisement on the "Casual Encounters" section of Craigslist. Steven Pemberton responded. An MECTF officer replied, pretending to be a 13-year-old girl. Pemberton set up a time and place to meet, at which officers arrested him. A jury convicted him of attempted rape of a child in the second degree, attempted commercial sexual abuse of a minor, communication with a minor for immoral purposes, and possession of a controlled substance. Pemberton raises several issues on appeal and through a statement of additional grounds (SAG) and Personal Restraint Petition (PRP). We affirm Pemberton's convictions and remand for the trial court to strike two community custody conditions and to correct two scrivener's errors.

I. BACKGROUND

MECTF commenced a "Net Nanny" sting operation in Kitsap County. In such an operation, MECTF works undercover using different personas, such as a

Citations and pin cites are based on the Westlaw online version of the cited material.

13-year-old runaway girl or boy, to go on social media sites and "contact people who are interested in having sex with kids." For the operation in Kitsap County, MECTF used the "Casual Encounters" section of Craigslist to post an ad. The Craigslist site conveyed that, to use this section, one must be 18 or older. MECTF titled the ad "crazy and young. looking to explore." The ad also provided, that the person was looking for a guy "that can teach [her] what its like to be an adult."

Pemberton responded to the ad through email, expressing interest and sending two photos of his penis. The person wrote back, saying, among other things, "Im 13, but I know what to do." The person also purported to attach a photo of herself and a friend, which was actually a photo of two law enforcement officers who looked young. After exchanging emails, the two began texting. The person who posted the ad identified themselves as "Brandi." Brandi, however, was actually a Kitsap County Sheriff's detective. Brandi asked Pemberton, "you down with me being 13[?]" Pemberton did not respond to the question.

Brandi and Pemberton texted over a two-day period. Brandi said that she was "looking for a daddy who [she] can have some fun with and get [her] some roses," and clarified that "roses" meant money. Brandi texted that she thought Pemberton "wanted some fun" with her, to which he responded that they "would have to discuss that in person." Later, when Brandi texted after her phone had died, she told Pemberton "maybe I can suck you for a phone charger" and that she "could do more to [him]" if he wanted. Pemberton again said that they would

2

have to "talk in person" because he was "not even trying to catch some criminal charges."

In later texts, Pemberton said that he was "the one that has everything you want." Brandi responded, "have a big dick that what i want." When Brandi asked Pemberton if she had scared him off, he replied, "You haven't scared me one bit your not big enough to scare me."

The two planned to meet up the next day. On that day, Brandi said that she thought she, her friend "Anna," and Pemberton "were gonna do some condom testing." Brandi also asked for $40 to get more minutes for her phone. Brandi told Pemberton to come to her friend Anna's home because the latter's mother was out of town. Pemberton asked Brandi if she drank alcohol or did drugs for fun. Brandi said she was curious about "meth" because a friend told her "sex on meth was amazing." Pemberton responded, "That is a very true statement." The two eventually agreed to meet at a Starbucks.

The police located Pemberton near the Starbucks where he was to meet Brandi. They pulled Pemberton over in his truck and arrested him. The police then searched Pemberton's truck and collected his cellphone and "a little orange straw" that contained methamphetamine.

The State charged Pemberton with attempted rape of a child in the second degree, attempted commercial sexual abuse of a minor, communication with a minor for immoral purposes, and possession of a controlled substance.

A jury convicted Pemberton as charged. Pemberton appeals.

## II. ANALYSIS

A. Sufficiency of the Evidence

Pemberton argues that the State presented insufficient evidence for count 2, attempted commercial sex abuse of a minor, because the evidence did not show that he offered to exchange anything of value for sex. We disagree. When a defendant challenges the sufficiency of the evidence on appeal, "we draw all inferences in favor of the State and interpret them most strongly against the defendant." State v. Garbaccio, 151 Wn. App. 716, 742, 214 P.3d 168 (2009). "Evidence is sufficient to support a conviction if, when viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime proved beyond a reasonable doubt." Garbaccio, 151 Wn. App. at 742.

To prove attempt under RCW 9A.28.020(1), the State must prove the defendant "with intent to commit a specific crime, . . . d[id] any act which is a substantial step toward the commission of that crime." A substantial step is an action strongly corroborative of the defendant's criminal purpose. State v. Johnson, 173 Wn.2d 895, 899, 270 P.3d 591 (2012). Additionally, a person commits the crime of commercial sexual abuse of a minor if "[they] provide[] or agree[] to provide anything of value to a minor or a third person pursuant to an understanding that in return therefore such minor will engage in sexual conduct with [them]." RCW 9.68A.100(1)(b).

Pemberton asserts the State failed to provide sufficient evidence because "[he] never agreed to provide anything of value in exchange for sex." But the

State needed to prove only that Pemberton, with the requisite intent, took a substantial step toward agreeing to provide anything of value to a minor in exchange for sexual conduct. RCW 9A.28.020(1); 9.68A.100. Brandi brought up the exchange of sex for money when she messaged, "im looking for a daddy who I can have some fun with and get me some roses." After Brandi clarified that "roses" meant "money," Pemberton said that they "would have to discuss that in person." A few texts later, Brandi told Pemberton "maybe I can suck you for a phone charger." Pemberton replied, "Oh really now," and then again said that they would "talk in person" because he was "not even trying to catch some criminal charges." Finally, Brandi and Pemberton discussed him giving her money for more minutes on her phone:

> [Brandi:]     thought the three of us were gonna do some condom testing lol
>
> [Pemberton:] Oh is that what you're needing
>
> [Brandi:]     [Y]es babe. And a few bucks for it that cool?
>
> [Pemberton:] Hmmmmmm..... What's a few bucks????
>
> [Brandi:]     40 it will get me more minutes for my phone
>
> [Pemberton:] Interesting. Very interesting
>
> . . .
>
> [Brandi:]     Anna's mom job takes out of town for like a week a few months then we get to do our own thing.
>
> What u think w're [sic] able to fuck a guy three way with my in the kitchen
>
> [Pemberton:] Freeway huh. So you get money and Anna doesn't?
>
> [Brandi:]     im the one that needs a phone card if you want to pay her for sex you can lol
>
> [Pemberton:] I never said I was paying for sex. I was just helping you out with some phone time

> [Brandi:] I didn't ask for money for sex why when we want it i just need a phone card

Viewing the evidence in the light most favorable to the State, Pemberton knew that Brandi sought various things of value–money, a phone charger, $40 for phone minutes–in exchange for sexual conduct. Though Pemberton did not explicitly agree to such an arrangement, he did not refuse to provide these things in exchange for sexual relations. Instead, Pemberton told them they would need to speak in person so that he would not "catch some criminal charges." Furthermore, Pemberton seemingly acknowledged the money-for-sex arrangement when he texted, "What's a few bucks" and "So you get money and Anna doesn't." Drawing all reasonable inferences in favor of the State, a rational trier of fact could conclude that through these text messages, Pemberton took a substantial step toward agreeing to provide something of value in exchange for sexual conduct beyond a reasonable doubt.

Pemberton also argues that the fact that he did not have any money or a phone card on his person when he was arrested shows that he did not commit the crime. But Pemberton made this argument to the jury, and they rejected it. We defer to the trier of fact on the persuasiveness of the evidence. State v. Hernandez, 85 Wn. App. 672, 675, 935 P.2d 623 (1997). We determine sufficient evidence supported Pemberton's conviction for attempted commercial sex abuse of a minor.

B. Sufficiency of the Charging Language for Attempted Commercial Sex Abuse of a Minor

Pemberton claims that we should reverse his conviction for attempted commercial sex abuse of a minor because the use of outdated charging language failed to apprise him of the essential elements of the crime. The State contends that we should uphold the conviction because the unartful charging language did not prejudice Pemberton. We agree with the State.

The language charging attempted commercial sex abuse of a minor in Pemberton's amended information provides that he took a substantial step to pay, or agree to pay, a "fee" in exchange for sexual conduct with a minor. But earlier in 2017, the legislature had revised RCW 9.68A.100, regarding commercial sex abuse of a minor.[1] LAWS OF 2017, ch. 231. While the statute had required before that the defendant had paid or agreed to pay a fee, the legislature amended the statute to require that the defended provided or agreed to provide "anything of value." LAWS OF 2017, ch. 231, § 3. The legislature made this change to account for the "practical reality" of the crime, "which often involve an exchange of drugs or gifts for the commercial sex act." LAWS OF 2017, ch. 231, § 1.

Pemberton asserts that the use of the outdated charging language failed to put him on notice of all the essential elements of the charged crime. "We review challenges to the sufficiency of a charging document de novo." State v. Lindsey, 177 Wn. App. 233, 244, 311 P.3d 61 (2013).

---

[1] The revision became effective on July 23, 2017. S.B. 5030, 65th Leg., Reg. Sess. (Wash. 2017).

A charging document must include all essential elements of a crime, both statutory and nonstatutory, to notify the accused of the nature and cause of the accusation against them. State v. Kjorsvik, 117 Wn.2d 93, 97, 812 P.2d 86 (1991). If the information fails to allege each essential element, the charged crime must be dismissed. State v. Pry, 194 Wn.2d 745, 752, 452 P.3d 536 (2019). "An 'essential element is one whose specification is necessary to establish the very illegality of the behavior' charged." Pry, 194 Wn.2d at 752 (quoting State v. Johnson, 119 Wn.2d 143, 147, 829 P.2d 1078 (1992)). But "it has never been necessary to use the exact words of a statute in a charging document." Kjorsvik, 117 Wn.2d at 108. Instead, "it is sufficient if words conveying the same meaning and import are used." Kjorsvik, 117 Wn.2d at 108.

To determine whether the amended information sufficiently charged attempted commercial sex abuse of a minor, we apply a two-pronged test: "(1) do the necessary elements appear in any form, or by fair construction, on the face of the document and, if so, (2) can the defendant show [they were] actually prejudiced by the unartful language." State v. Zillyette, 178 Wn.2d 153, 162, 307 P.3d 712 (2013) (citing Kjorsvik, 117 Wn.2d at 105-06). The State meets the first prong if the charging language "would reasonably apprise an accused of the elements of the crime charged." Kjorsvik, 117 Wn.2d at 109. When making this determination, we read the words in the charging document as a whole and construe them according to common sense. Kjorsvik, 117 Wn.2d at 109. If the State cannot satisfy the first prong, we presume prejudice and reverse. Pry, 194 Wn.2d at 753.

Because Pemberton challenges the sufficiency of the charging document for the first time on appeal, we construe it liberally. See Pry, 194 Wn.2d at 752. Under such liberal construction, "when an objection to an indictment is not timely made the reviewing court has considerable leeway to imply the necessary allegations from the language of the charging document." Kjorsvik, 117 Wn.2d at 104.

Liberally construing the amended information, the charging language reasonably apprised Pemberton of the essential elements of the crime. Though the amended information used "fee" instead of "anything of value," the information did not need to restate the precise statutory language. See Pry, 194 Wn.2d at 752 ("the information need not restate the precise language of the essential elements of a crime"). The use of "fee" conveyed that the State believed Pemberton had taken a substantial step toward agreeing to provide something of value in exchange for sexual conduct. This is not a case in which specifying exactly what Pemberton would agree to provide in exchange for sexual conduct is necessary to establish the illegality of the behavior charged. See, e.g., Zillyette, 178 Wn.2d at 160 (quoting State v. Ward, 148 Wn.2d 803, 811, 64 P.3d 640 (2003) ("However, because not all controlled substances can be the basis for controlled substances homicide, some degree of specification 'is necessary to establish the very illegality of the behavior charged' in order to charge a person with controlled substances homicide."). Thus, when reading the charging language in a commonsense manner, a fair construction of the

9

amended information conveyed the necessary element of exchanging something of value in exchange for sexual conduct of a minor.

Having concluded that the State meets the first prong, we would typically next consider whether the charging language still prejudiced Pemberton. But because Pemberton has the burden of raising and showing prejudice and fails to address this issue, we will not consider the issue further. See Lindsey, 177 Wn. App. at 246 (refusing to consider the prejudice prong when the defendant did not argue it). We determine the charging language was sufficient.

C.  CrR 3.5

Pemberton contends that because the trial court did not enter written findings of fact and conclusions of law (FFCL) after the CrR 3.5 hearing, we must remand. The State asserts that the error was harmless and therefore does not require remand. We agree with the State.

CrR 3.5(c) requires that "[a]fter the [CrR 3.5] hearing, the court shall set forth in writing: (1) the undisputed facts; (2) the disputed facts; (3) conclusions as to the disputed facts; and (4) conclusion as to whether the statement is admissible and the reasons therefore." Thus, a trial court's failure to enter written FFCL after a CrR 3.5 hearing constitutes error. State v. France, 121 Wn. App. 394, 401, 88 P.3d 1003 (2004). But such error "is harmless as long as oral findings are sufficient to allow appellate review." State v. Thompson, 73 Wn. App. 122, 130, 867 P.2d 691 (1994).

Although the trial court below did not enter written findings, its oral ruling sufficed to permit appellate review and Pemberton does not argue otherwise. In

admitting Pemberton's statements, the court noted that police had advised him of his rights more than once, he signed an advisement form, and no evidence showed that he was under the influence. Additionally, it recognized that Pemberton was cooperative, gave appropriate answers to questions, and did not ask for an attorney. The court also stated that Pemberton asking to speak to officer constituted further indicia of the voluntariness of his statements.

As Pemberton does not explain how the court's failure to enter the findings prejudiced him, or even challenge the findings and conclusions made at the hearing, we determine the error was harmless. We decline to remand for entry of written FFCL.

D. Community Custody Provisions

Pemberton challenges two of his community custody provisions. First, he asserts that a provision preventing him from entering locations where the primary product is alcohol is not sufficiently crime-related. Second, he claims that a provision requiring him to inform his Community Corrections Officer of any romantic relationships to verify there are no victim-age children involved is unconstitutionally vague. We address each challenge in turn.

"We review community custody conditions for an abuse of discretion and will reverse them if they are manifestly unreasonable." State v. Nguyen, 191 Wn.2d 671, 678, 425 P.3d 847 (2018). It is manifestly unreasonable for a trial court to impose an unconstitutional condition. Nguyen, 191 Wn.2d at 678.

1.  Alcohol Community Custody Provision

Pemberton challenges a community custody condition preventing him from entering any location where alcohol is the primary product. He claims the condition is not statutorily authorized because it is not directly related to the circumstances of his crimes. We agree.

The court attached an appendix titled "Additional Conditions of Sentence" to Pemberton's Judgment and Sentence. Under "Crime Related Prohibitions," the fifth condition stated, "Do not enter any location where alcohol is the primary product, such as taverns, bars and/or liquor stores."

RCW 9.94A.703(3)(f) permits sentencing courts to exercise their discretion to impose any crime-related prohibitions as community custody provisions. "A 'crime-related prohibition' means an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." Nguyen, 191 Wn.2d at 683 (quoting RCW 9.94A.030(10)). We typically uphold community custody conditions if a reasonable relationship exists between the crime and the condition. Nguyen, 191 Wn.2d at 684. "The prohibited conduct need not be identical to the crime of conviction, but there must be 'some basis for the connection.'" Nguyen, 191 Wn.2d at 684 (quoting State v. Irwin, 191 Wn. App. 644, 558-59, 364 P.3d 830 (2015)).

The State does not assert any facts showing that alcohol related to the circumstances of Pemberton's crimes or contributed to his commission of them. Instead, the State merely argues that Nguyen "expanded the universe" so that "[t]hings that go to the particular defendant's character, like impulsivity, may be

considered by the trial court in imposing conditions of sentence." While Nguyen provided that sentencing courts may use "their discretion to impose prohibitions that address the cause of the present crime or some factor of the crime that might cause the convicted person to reoffend," it maintained that a sufficient connection must exist between the prohibition and the convicted crime. 191 Wn.2d at 684-86. The State fails to point to any evidence in the record connecting alcohol to any of Pemberton's convicted crimes. Because no reasonable relationship exists between Pemberton's crimes and the prohibition on him entering locations where alcohol is the primary product, the trial court abused its discretion by imposing it. See State v. Morgan, noted at 10 Wn. App. 2d 1033, slip op. at 6 (2019) (determining a trial court erred in imposing a community custody provision to not enter locations where alcohol is the primary source of business because "nothing in the record indicates that alcohol contributed to the [defendant's] offenses"). We remand for the trial court to strike the provision.[2]

---

[2] The State also contends that because Pemberton possessed methamphetamine at the time of his arrest, the prohibition on entering places where alcohol is the primary product was reasonably related to his crimes. The State provides that it "sees little difference between one drug or the other–alcohol is a drug." This argument, however, contradicts courts holding that alcohol is not interchangeable with other substances. See State v. Munoz-Rivera, 190 Wn. App. 870, 893, 361 P.3d 182 (2015) (noting that if alcohol, but not another substance, contributed to a crime then evaluation and treatment for substances other than alcohol are not crime related); State v. Jones, 118 Wn. App. 199, 202, 207-08, 76 P.3d 258 (2003) (holding that trial court erred by imposing a community custody provision that required the defendant to participate in alcohol counseling where no evidence demonstrated that alcohol contributed to the crimes, even though the defendant was under the influence of methamphetamine at the time of his crime). As a result, we reject this argument.

2. Romantic Relationships Community Custody Provision

Pemberton also challenges as unconstitutionally vague a community custody provision requiring him to inform his Community Corrections Officer of any romantic relationships to verify there are no victim-age children involved. We agree.

Condition 19 under the "Crime Related Prohibitions" section of Pemberton's Additional Conditions of Sentence stated that he "[s]hall inform [his] Community Corrections Officer of any romantic relationships to verify that there are no victim-age children involved."

"A community custody condition is unconstitutionally vague if it '(1) ... does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed, or (2) ... does not provide ascertainable standards of guilt to protect against arbitrary enforcement.'" Nguyen, 191 Wn.2d at 678 (quoting City of Spokane v. Douglass, 115 Wn.2d 171, 178, 795 P.2d 693 (1990)) (alterations in original). A community custody provision is not unconstitutionally vague simply because a person cannot predict with absolute certainty the exact point at which their actions would constitute prohibited conduct. Nguyen, 191 Wn.2d at 679.

Pemberton argues that "[t]he term 'romantic relationship' lacks sufficient definiteness such that an ordinary person would understand what conduct is proscribed." Our Supreme Court addressed a similar argument in Nguyen, and determined that "a person of ordinary intelligence can distinguish a 'dating relationship' from other types of relationships." 191 Wn.2d at 682 (quoting

RCW 26.50.010(2). The Court noted, however, that, rather than the term "dating," the term "'romantic' [was a] highly subjective qualifier[]." Nguyen, 191 Wn.2d at 683. Division III similarly held that the term "romantic relationships" is unconstitutionally vague. State v. Peters, 10 Wn. App. 2d 574, 590, 455 P.3d 141 (2019). Because it is often difficult to determine at what point a relationship becomes "romantic," the term "romantic relationships" is not definite enough for an ordinary person to understand what conduct is proscribed. We adhere to the analysis from Nguyen and the holding in Peters and conclude that the "romantic relationship" community custody provision here is unconstitutionally vague. Because imposing an unconstitutional condition constitutes an abuse of discretion, the trial court abused its discretion by imposing it. See Nguyen, 191 Wn.2d at 678. We remand for the sentencing court to strike the provision from Pemberton's Judgment and Sentence.

   E. Scrivener's Error

   Pemberton asks us to remand for correction of two scrivener's errors on his Judgment and Sentence. The State agrees that the Judgment and Sentence contains two scrivener's errors that the trial court should correct. We agree and remand for correction of the errors.

   Pemberton points to two portions of his Judgment and Sentence that he identifies as scrivener's, or clerical, errors. First, the Judgment and Sentence says that he pleaded guilty, even though a jury convicted him after a trial. Second, the criminal history portion provides that the date of a crime for

15

possession of a dangerous weapon was January 19, 2015, but that he was sentenced for the crime nearly two years earlier on February 12, 2013.

CrR 7.8 provides that "[c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders." CrR 7.8(a). When a scrivener's error occurs in a Judgment and Sentence, the remedy is to remand to the trial court for correction. In re Pers. Restraint Petition of Mayer, 128 Wn. App. 694, 701-02, 117 P.3d 353 (2005).

The errors pointed out by Pemberton constitute clerical mistakes covered under CrR 7.8. For these reasons, we remand for the trial court to correct the errors.

F. SAG

1. Brady[3] Violation

Pemberton asserts that the State committed a Brady violation related to "text message exhibits" because he "did not receive evidence that admitted at the trial until 90 days after [his] trial was over." A Brady violation has three components: "'[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" In re Pers. Restraint of Stenson, 174 Wn.2d 474, 486-87, 276

---

[3] Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

P.3d 286 (2012) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 286 (1999)).

In his SAG, Pemberton fails to identify which text message exhibits the State allegedly suppressed, but his PRP suggests that he refers to exhibits 5 and 6.[4]  The exhibits appear to be text messages sent from Pemberton's phone, but do not include all the text messages sent between him and Brandi.  Though Pemberton labels these exhibits as "key evidence," he does not explain how the evidence is exculpatory or impeaching.  Additionally, exhibit 4 includes all the text messages from exhibits 5 and 6, and Pemberton does not claim that the State suppressed or withheld exhibit 4.  Because Pemberton cannot establish the elements necessary to show a Brady violation, we reject his claim.

2.  Right to Choose Defense - Entrapment

Pemberton claims that his Sixth Amendment rights were violated because his attorney would not argue entrapment as a defense.  We disagree.

We review de novo allegations of constitutional violations.  State v. Lynch, 178 Wn.2d 487, 491, 309 P.3d 482 (2013).

A criminal defendant's right to control their defense is implicit in the Sixth Amendment.  Lynch, 178 Wn.2d at 491.  Encompassed in this right is the decision to present an affirmative defense.  State v. Coristine, 177 Wn.2d 370, 376, 300 P.3d 400 (2013).  But this right has limits.  Coristine, 177 Wn.2d at 377.

---

[4] Pemberton also appears to claim that the exhibits constitute newly discovered evidence.  But as the court admitted the exhibits at trial, he cannot show that they were newly discovered.  See CrR 7.8(b)(2) ("Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 7.5.").

17

To present an affirmative defense, a defendant "must offer sufficient admissible evidence to justify giving the jury an instruction on the defense." State v. Ginn, 128 Wn. App. 872, 879, 117 P.3d 1155 (2005).

RCW 9A.16.070 defines the entrapment defense:

(1) In any prosecution for a crime, it is a defense that:

(a) The criminal design originated in the mind of law enforcement officials, or any person acting under their direction, and

(b) The actor was lured or induced to commit a crime which the actor had not otherwise intended to commit.

(2) The defense of entrapment is not established by a showing only that law enforcement officials merely afforded the actor an opportunity to commit a crime.

Here, the evidence did not support an entrapment defense. MECTF created an advertisement on Craigslist that conveyed a "crazy and young" girl was looking for someone to teach her "what its like to be an adult." Pemberton initiated contact by answering the advertisement and then continued the contact through text messages. Pemberton kept talking to Brandi even though she told him she was 13 years old. This evidence demonstrates that the police afforded Pemberton the opportunity to commit the crimes, but did not lure or induce him to. Because Pemberton failed to show sufficient evidence to justify an entrapment defense, his lawyer's decision to not use the defense at trial did not violate Pemberton's Sixth Amendment rights.[5]

---

[5] Pemberton also argues in his PRP that the police improperly targeted him. But Pemberton fails to explain how MECTF posting an ad and waiting for responses amounted to targeting. He also does not provide any citations to case law for this argument. Thus, we reject this claim.

3. Sufficiency of the Evidence

a. Attempted Rape of a child in the second degree

Pemberton asserts that his driving to Bremerton did not constitute a substantial step toward the crime of attempted rape of a child. We disagree.

As discussed above, a person attempts a crime if they take a substantial step towards its commission. RCW 9A.28.020(1). An action strongly corroborative of the defendant's criminal purpose constitutes a substantial step. Johnson, 173 Wn.2d at 899. "Evidence is sufficient to support a conviction if, when viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime proved beyond a reasonable doubt." Garbaccio, 151 Wn. App. at 742.

Under RCW 9A.44.076 (1), a person commits rape of a child in the second degree "when the person has sexual intercourse with another who is at least twelve years old but less than fourteen years old and not married to the perpetrator and the perpetrator is at least thirty-six months older than the victim."

Pemberton responded to the Craigslist ad with photos of his penis. He then continued to text Brandi about having sexual relations with her even though she told him she was 13 years old. Pemberton continued to text with Brandi after she said she wanted "a big dick," to "do some condom testing," and to "fuck a guy three way." The two exchanged several text messages setting up a time and place to meet. When it came time to meet, Pemberton told Brandi that it was "[t]ime to put up or shut up." Pemberton then drove to nearby a park at the time Brandi said she was walking there. The two discussed having sex on

19

methamphetamine and Pemberton had the drug when arrested. Viewing these facts in the light most favorable to the State, a rational juror could have found beyond a reasonable doubt that Pemberton's conduct was strongly corroborative of the criminal purpose of having sex with a person between 12 and 14 years old.

   b.  Communication with a minor for immoral purposes

Additional Ground 5 of Pemberton's SAG provides, "Next I want to challenge the validity of count 3 communication with a minor for immoral purposes. To be convicted of this a defendant must believe that the other person was a minor." Pemberton's statement appears to challenge the sufficiency of the evidence for his conviction for communication with a minor for immoral purposes because he did not believe Brandi was a minor. Indeed, RCW 9.68A.090(1) provides that a person is guilty of the crime if "a person who communicates with someone the person believes to be a minor for immoral purposes."

But the evidence shows that after Pemberton responded to Brandi's Craigslist advertisement through e-mail, she responded "Im 13, but I know what to do." Later, through text message, Brandi again told Pemberton that she was 13. Given that Brandi told Pemberton that she was 13 at least twice, a rational juror could find beyond a reasonable doubt that Pemberton believed Brandi was a minor. Other evidence suggests Brandi may have been over 18 years old, such as one needing to affirm that they are 18 to enter the Casual Encounters section on Craigslist and that the photo Brandi sent of herself was actually a photo of a young-looking law enforcement officer. But we defer to the trier of fact on the persuasiveness of the evidence. Hernandez, 85 Wn. App. at 675.

20

Drawing all inferences and viewing all facts in favor of the State, we determine the sufficient evidence supported the jury's conclusion that Pemberton committed communication with a minor for immoral purposes.

4.      Police Misconduct

Pemberton contends that "[l]aw enforcement violated [his] Fifth and Fourteenth Amendment to the United States Constitution due process right to fundamental fairness with its illegal actions and illegal tactics."  We disagree.

We review de novo constitutional issues.  Zillyette, 178 Wn.2d at 158.

A police officer's conduct may violate due process principles if it is so outrageous that it shocks the universal sense of fairness.  State v. Lively, 130 Wn.2d 1, 19, 921 P.2d 1035 (1996).  If law enforcement acts in such a manner, then due process principles would bar the State from using the judicial process to convict the defendant.  Lively, 130 Wn.2d at 19.  Courts evaluate the totality of the circumstances when reviewing a defense of outrageous government conduct. Lively, 130 Wn.2d 21.  Five factors guide a court's analysis:

> There are several factors which courts consider when determining whether police conduct offends due process: whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity; whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation; whether the government controls the criminal activity or simply allows for the criminal activity to occur; whether the police motive was to prevent crime or protect the public and whether the government conduct itself amounted to criminal activity or conduct "repugnant to a sense of justice."

Lively, 130 Wn.2d at 22 (internal citations omitted) (quoting People v. Isaacson, 44 N.Y. 2d 511, 378 N.E. 2d 714, 719, 406 N.Y. 2d 714 (1978)).

Below, Pemberton filed several post-conviction motions under CrRs 7.4 and 7.5. After a hearing, the trial court entered written FFCL. The court made several findings on the five factors related to the outrageous government conduct defense:

1) The police, in this case, infiltrated ongoing criminal activity. Sergeant Rodriguez has investigated instances of child exploitation and sexual abuse through the internet for several years. The current form of investigation was designed to infiltrate the already extensive sexual exploitation of children on our internet. The investigations are created using information obtained from other criminal investigations. In this case, the defendant choose [sic] to respond to and communicate with someone he believed was a 13 year old despite the undercover's attempts to end communications.

2) Law Enforcement did not engage in persistent solicitation to overcome the defendant's reluctance to commit the crime because the defendant was never reluctant to commit the crime. The defendant repeatedly communicated with the undercover and pursued the conversation, eventually driving across town to meet with, who he believed, was a 13-year-old girl.

3) The government did not control the criminal behavior but simply allowed for the criminal activity to occur. Although law enforcement made the initial post and engaged in sexual conversation, it was the defendant who decided what the terms were for meeting the undercover. The defendant decided the location and when he would meet with the undercover. The undercover's attempts to discontinue the conversation were quickly rebuffed by the defendant who indicated that he wished to pursue the conversation.

4) The current investigation was designed to prevent crime and protect the public.

5) The government's conduct did not amount to criminal activity and was not repugnant to a sense of justice. The investigation gave the defendant several opportunities to abandon his criminal intent, yet the defendant choose [sic] to continue the conversation and criminal behavior.

Pemberton does not explain how the court's findings are incorrect or challenge them on appeal. Unchallenged findings of fact are verities on appeal. State v.

Pillon, 11 Wn. App. 2d 949, 971, 459 P.3d 339 (2020). Accepting the trial court's findings as verities, we can conclude only that the government did not act outrageously. Indeed, given that the police posted an advertisement, waited for a response, and even purportedly attempted to discontinue conversation,[6] its actions do not shock the universal sense of fairness. Pemberton's outrageous police conduct defense fails.[7]

We affirm Pemberton's convictions and remand for corrections to his Judgment and Sentence consistent with this opinion.

_____
                                        Chun, J.

WE CONCUR:

_____        _____
                                        Dwyer, J.

---

[6] Pemberton texted "???" when Brandi did not respond for 11 minutes; "Sooo" after Brandi texted "gotcha have a nice day," and when Pemberton wanted to meet at 7 a.m., Brandi texted "i'll pass to early for me."

[7] Pemberton's PRP raises the same issues that he raised in his SAG–i.e., Brady violation, entrapment, and outrageous police conduct. For the reasons explained in our analysis, these arguments fail on their merits.

To the extent Pemberton's PRP raises ineffective assistance of counsel arguments in relation to his claims of Brady violation, entrapment, and outrageous police conduct, these arguments fail because, as we rejected these claims on their merits, he cannot show prejudice. See State v. Grott, 195 Wn.2d 256, 274, 458 P.3d 750 (2020) (providing that to succeed on an ineffective assistance of counsel claim the defendant must establish both deficient performance and prejudice).

Finally, Pemberton argues in his PRP that the court violated CrR 7.8 by failing to transfer to the Court of Appeals two other motions that he filed on September 1, 2018 and September 11, 2018. But Pemberton did not include these motions in the appellate record. As the appellant, Pemberton has the burden to provide an adequate record to establish error. State v. Hernandez, 6 Wn. App. 2d 422, 429, 431 P.3d 126 (2018). Because we do not have an adequate record to review this claim, we do not address it.