IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54670-1-II |
| Respondent, | |
| v. | |
| CURTIS POUNCY, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, C.J. — Curtis Pouncy appeals his convictions for attempted second degree rape of a child and communication with a minor for immoral purposes. Pouncy argues that (1) the State failed to provide sufficient evidence in proving that he committed the charged crimes, (2) the trial court violated his constitutional right to present a defense by refusing to instruct the jury on entrapment, (3) the trial court erred by denying Pouncy's motion to suppress evidence because law enforcement violated his privacy rights, and (4) the trial court erred in denying his motion to dismiss because the Missing and Exploited Children Task Force (MECTF) engaged in outrageous government conduct.

We find no error and affirm.

FACTS

Pouncy was arrested during a Net Nanny operation run by MECTF. Net Nanny is an undercover law enforcement operation where the Washington State Patrol (WSP) investigates people looking to have sexual relations with minors. As part of the Net Nanny operation, Detective

Jake Klein created a fictitious female profile using the name "Alexis" and posted the profile on an online dating app.

Pouncy responded to "Alexis'" profile on the app. The conversation between Pouncy and "Alexis" quickly moved to text messaging, where "Alexis" revealed that she was a 13-year-old girl. After being told "Alexis" was 13 years old, Pouncy continued to engage in conversation with "Alexis" through text messaging and phone calls. Detective Klein played the role of "Alexis" in text messages and the app.

Pouncy requested photographs from "Alexis," discussed what he was planning to do with "Alexis" when they eventually met up, and asked "Alexis" repeatedly to send him her address. After two days of communicating with "Alexis" by text and phone,[1] Pouncy drove to meet "Alexis" at her house. When Pouncy arrived at "Alexis'" house, Trooper Wilcox opened the door. Pouncy entered the house, attempted to kiss "Alexis," and was arrested.

The State charged Pouncy with attempted second degree rape of a child and communication with a minor for immoral purposes.

A.      MOTION TO DISMISS AND MOTION TO SUPPRESS EVIDENCE

Prior to trial, Pouncy filed a motion to dismiss the charges, arguing for dismissal due to outrageous government conduct by MECTF. Pouncy also moved to suppress the electronic messages he exchanged with "Alexis," arguing that his privacy rights were violated under the Washington Privacy Act chapter 9.73 RCW (WPA) and article I, section 7 of the Washington Constitution.

---

[1] WSP Trooper Jennifer Wilcox played the role of "Alexis" in phone calls.

In his motion to dismiss, Pouncy claimed that MECTF engaged in outrageous government conduct because the program was funded by a private organization, Operation Underground Railroad (OUR). Pouncy alleged that this funding was used to pay the overtime hours of MECTF agents engaged in Net Nanny operations. He argued this affected the agents' ability to remain impartial in their law enforcement activities and created a private interest in the arrest and prosecution of any person through these operations.

Pouncy also argued that MECTF improperly solicited funds from OUR. Pouncy contended that while the statute allows for the state patrol chief to solicit funding from private organizations, this authority is non-delegable. As a result, Pouncy believed the solicitation of funds from OUR by WSP Sergeant Carlos Rodriguez was outside the statutory bounds.

Further, Pouncy claimed that MECTF engaged in outrageous government conduct based on the totality of circumstances. Pouncy argued that the officers instigated the charged crimes when they created and posted a profile of a fictitious 13-year-old girl and then controlled the ongoing activity once Pouncy engaged in conversation with "Alexis." Pouncy questioned MECTF's motive in preventing crime or protecting the public in light of the money they received from OUR. Finally, Pouncy argued that MECTF was engaged in activity that was repugnant to a sense of justice and violated the law.

Pouncy also moved to suppress the electronic messages[2] he exchanged with "Alexis." He claimed that MECTF officers violated the WPA when they intercepted these messages. Further,

---

[2] Electronic messages included the messages exchanged between Pouncy and Detective Klein posing as "Alexis" on the dating app, as well as text messages exchanged between Pouncy and "Alexis" over the phone.

Pouncy argued that the interception of his electronic messages violated article I, section 7 of the Washington Constitution.

At the evidentiary hearing on Pouncy's motions to dismiss and suppress evidence, Sergeant Rodriguez provided testimony about the Net Nanny operations and OUR. He testified that he previously supervised MECTF. The purpose of Net Nanny operations is to recover minors who may be exploited for sexual services, arrest people who are exploiting children, and arrest people who are seeking those types of services from minors. MECTF officers are responsible for setting up accounts on dating applications. These accounts are attempts to stop individuals from committing sexual crimes against children.

Sergeant Rodriguez personally solicited donations for MECTF from OUR. While soliciting donations, he kept others at WSP apprised of his actions and involved his command staff in the process. Others also solicited donations for MECTF, and the WSP website has a link where people can donate to MECTF. Potential donors were directed to go to the WSP website in order to donate to MECTF.

OUR provided equipment and monetary funding to MECTF. However, OUR was not responsible for writing the paychecks for law enforcement officers that participated in Net Nanny operations. In fact, OUR had no control over any aspect of the Net Nanny operations.

In addition to testimony, exhibits were entered as evidence at the hearing. This included the MECTF Standard Operating Procedures Manual, the messages exchanged between "Alexis" and Pouncy on the dating app, and the text messages exchanged between "Alexis" and Pouncy.

The electronic messages exchanged between Pouncy and "Alexis" show that Pouncy initiated the conversation with "Alexis." Further, Pouncy continued to have conversations with "Alexis" after learning that she was a 13-year-old girl.

Pouncy asked "Alexis" for photos of herself. He also asked "Alexis" if she was a virgin, if she lived at home, and if her parents were around. On two occasions, Pouncy asked "Alexis" to call him on the phone. Pouncy also asked "Alexis" to send him her address on at least five separate occasions.

The electronic text messages show that on two separate occasions, Pouncy decided to stop talking to "Alexis." On the first occasion Pouncy texted, "Hey I am not coming."[3] Hearing Ex. 2 at 5. "Alexis" responded with "aww" and a sad face emoji. Hearing Ex. 2 at 5. Six minutes later, Pouncy asked "Alexis" to call him, which "Alexis" did. They continued to text after the phone call ended. On the second occasion, Pouncy texted, "But it feels like you dont want to do anything so I will let you move on." Hearing Ex. 2 at 6. "Alexis" responded with "ur bein a jerk." Hearing Ex. 2 at 6. Without any prompting, Pouncy then texted, "Want me to come over . . . We can do it right now." Hearing Ex. 2 at 6.

The trial court denied Pouncy's motion to dismiss and motion to suppress evidence. The trial court entered findings of fact and conclusions of law. In finding of fact 9, the trial court found that Pouncy "impliedly consented to the recording of his [dating app] and text communications on the recipient's device given his reasonable knowledge that communications may be retained by the recipient and shown to other people." Clerk's Papers (CP) at 105. In finding of fact 10, the

---

[3] We retain the original spelling, punctuation, and grammar in all quoted text messages.

5

trial court found that Pouncy "voluntarily disclosed information to the intended recipient and assumed the risk of being deceived about the recipient's identity." CP at 105. In finding of fact 11, the trial court found that "[t]here was no interception of [Pouncy's] communications with undercover officers in this case because [Pouncy] communicated directly with law enforcement." CP at 105.

The trial court concluded that MECTF did not engage in outrageous government conduct based on a review of the totality of circumstances. Specifically, the trial court concluded that there was no interception of Pouncy's communications and, while the chief of WSP is tasked with soliciting donations for MECTF, there is no authority prohibiting the chief from delegating this responsibility. The trial court denied Pouncy's motion to dismiss for outrageous government conduct.

The trial court also concluded that Pouncy's privacy rights were not violated because there was no interception of Pouncy's communications; instead, Pouncy had impliedly consented to the recording of his electronic messages when he sent them to "Alexis." The trial court also rejected Pouncy's article I, section 7 argument because nothing was searched or seized in this case, and any electronic communications that were "arguably 'seized'" did not give rise to an article I, section 7 argument because Pouncy "waived that interest when he voluntarily provided the communications to law enforcement." CP at 106. Accordingly, the trial court denied Pouncy's motion to suppress the electronic messages he exchanged with "Alexis."

B.     EVIDENCE AT TRIAL

At Pouncy's jury trial, the State presented the following evidence. Detective Klein testified about the dating app and his involvement with Pouncy. To communicate with others on this dating

website, a person must sign up for an account. Users must be 18 years or older to sign up. Further, the app requires that users not be a convicted felon or a sex offender. The app does not run any background checks to confirm that users are conforming to the rules.

Detective Klein created a fictitious profile for a 13-year-old girl named "Alexis" and posted the profile on the dating app. He used a photo of an undercover WSP trooper as "Alexis'" profile picture.[4] Detective Klein stated that he would generally include a statement such as "'young bored HMU'"[5] in the "'about me'" section.[6] 1 Verbatim Report of Proceedings (VRP) (Jan. 29, 2020) at 232.

Pouncy, who was 59 years old at the time, responded to "Alexis'" profile on the app. "Alexis" quickly directed the conversation to text messaging. Once the text messaging began, "Alexis" revealed her age as 13 years old. "Alexis" wrote, "13 but im mature." Trial Ex. 3 at 1. Pouncy responded, "That is young." Trial Ex. 3 at 1. "Alexis" reassured Pouncy that no one would find out if they had sexual relations.

After being told that "Alexis" was 13 years old, Pouncy continued the conversation by asking "Alexis" if she had "done this before," then subsequently asked her to send him a photograph. Trial Ex. 3 at 1. "Alexis" sent Pouncy photographs of Trooper Gasser that were altered to give Trooper Gasser a younger appearance. After receiving the photographs, Pouncy

---

[4] WSP Trooper Anna Gasser played the role of "Alexis" in photographs.

[5] "HMU" is an acronym for "hit me up." 1 Verbatim Report of Proceeding (VRP) (Jan. 29, 2020) at 232.

[6] Detective Klein was unable to capture a screenshot of the contents of "Alexis'" profile. The app banned the "Alexis" profile before he was able to do so. Therefore, we do not know the exact content of the "about me" section.

asked if "Alexis" was a virgin and whether she lived at home. Pouncy then texted, "I dont want to get you in trouble and I really dont want trouble." Trial Ex. 3 at 2.

At this point, Pouncy asked to speak with "Alexis" on the phone. Trooper Wilcox posed as "Alexis" on the phone call. During the phone call, Pouncy stated that he was "scared this is some Joe Walsh s[**]t." 1 VRP (Jan. 30, 2021) at 326. Trooper Wilcox testified that Joe Walsh is the host of the television show America's Most Wanted. "Alexis" and Pouncy then talked about meeting up at "Alexis'" home. Pouncy asked whether "Alexis'" mother would be there. "Alexis" asked Pouncy to bring condoms because she didn't want to get pregnant. Pouncy agreed that it would be bad if she got pregnant. He stated that he would bring condoms and alcohol.

Pouncy and "Alexis" continued to text after their phone call. When "Alexis" asked if Pouncy was going to come over, he answered yes and asked for an address. "Alexis" ignored this request. Pouncy asked "Alexis" for her address two more times that night. "Alexis" did not give Pouncy her address, but told him she was too tried and asked if they could meet up the following day instead.

The next day Pouncy texted, "So r we going to meet to night." Trial Ex. at 4. "Alexis" asked if he was going to bring condoms and alcohol like they had discussed. Pouncy answered yes.

"Alexis" then texted, "so i know we kinda tlked about it in the call but like wut r we gonna do when u get here?" Trial Ex. at 4. Pouncy responded that they would "see what happens." Trial Ex. at 4. "Alexis" responded, "im lookin 2 hookup 2nite lol i dont want 2 jst waist my time." Trial Ex. at 4. Pouncy assured "Alexis" that she wouldn't be wasting her time.

8

Pouncy texted "Alexis," "I dont even know where I am going." Trial Ex. at 4. "Alexis" told him that she lived on the west side of Olympia. He then asked "Alexis" to call him. When "Alexis" stated that she could not talk because her mother was in the house, Pouncy responded, "Hey I am not coming." Trial Ex. at 5. Alexis responded with "aww" and a sad face emoji. Trial Ex. at 5. Without prompting, Pouncy texted, "Call me." Trial Ex. at 5.

During that second phone call, Pouncy again asked "Alexis" for her address. "Alexis" told him to go to the gas station close to her. She then asked if he was going to bring condoms, to which he responded, "[Y]es." 1 VRP (Jan. 30, 2020) at 331. When asked what he wanted to do, Pouncy said, "[Y]ou know what I want to do." 1 VRP (Jan. 30, 2020) at 332. Pouncy stated that he would teach "Alexis." Before the conversation ended, Pouncy again asked "Alexis" for her address.

"Alexis" and Pouncy resumed texting after the second phone call. "Alexis" texted that she was worried—she wrote that there were things she didn't want to do because of her size and she didn't want to be in pain. Pouncy assured "Alexis" that she could control the pace. Pouncy then texted, "But it feels like you dont want to do anything so I will let you move on." Trial Ex. 3 at 6. "Alexis" responded, "i do but i jst dont know wut were gonna do unless u tell me." Trial Ex. 3 at 6. Pouncy texted, "Anything you want." Trial Ex. 3 at 6. When "Alexis" didn't respond immediately, Pouncy texted, "Still nothing," then, "Night." Trial Ex. 3 at 6. "Alexis" responded, "ur bein a jerk." Trial Ex. 3 at 6.

Without any prompting, Pouncy continued his conversation with "Alexis," texting, "We can do it right now." Trial Ex. 3 at 6. He again asked "Alexis" for an address. "Alexis" asked

9

Pouncy what was going to happen when he came over. Pouncy responded, "I teach you what I can . . . Slow and easy." Trial Ex. 3 at 6. "Alexis" then suggested they have another phone call.

During the third phone call, "Alexis" again asked Pouncy what he was going to do. Pouncy responded, "I will go slow. I will taste you, and you will taste me." 1 VRP (Jan. 30, 2020) at 334. When "Alexis" asked if they needed lube, Pouncy responded, "[N]o, the condoms have lube on them." 1 VRP (Jan. 30, 2020) at 335. Pouncy then stated, "I want to do this with you." 1 VRP (Jan. 30, 2020) at 335. He also stated, "[Y]ou will taste my juice and I will taste yours." 1 VRP (Jan. 30, 2020) at 335. Pouncy asked "Alexis'" to text him the address. "Alexis" did not text the address at that time.

"Alexis" and Pouncy again resumed texting after the phone call ended. Pouncy reassured "Alexis" when she asked, "if it hurts, u promise ull go slower?" Trial Ex. 3 at 7. Pouncy also agreed to bring condoms and alcohol. "Alexis" sent Pouncy an address for a gas station near her house.

Pouncy drove two hours to the gas station. "Alexis" then gave him an address to her house. Pouncy left the gas station and drove to the address "Alexis" provided. When he arrived, Pouncy parked down the block from the address and walked up to the house.

Trooper Wilcox, posing as "Alexis," opened the door when Pouncy arrived. When Pouncy entered the residence, he embraced "Alexis" and attempted to kiss her. Pouncy was then arrested. Pouncy did not have condoms or alcohol on him when he was arrested.

The State offered and the trial court admitted the messages exchanged between Pouncy and "Alexis" on the dating app, as well as the text messages exchanged between Pouncy and "Alexis."

Pouncy testified on his own behalf at trial. He stated that he believed "Alexis" to be an adult woman when he responded to her dating profile. When "Alexis" revealed that she was actually 13 years old, Pouncy did not believe her. He asked "Alexis" to send him pictures in order to confirm that she was not actually 13 years old. He also asked "Alexis" to call him in order to further confirm she was not a child. Based on this, Pouncy determined that "Alexis" was actually engaging in roleplay or acting out a fantasy and was not really a 13-year-old girl.

Pouncy further testified that he did not necessarily intend to have sexual intercourse with "Alexis," but only wanted to get to know her. When he stated, "I'll taste you and you will taste me," he was only referring to kissing and not oral sex. 1 VRP (Jan. 30, 2020) at 424. He denied that he said that they would taste each other's juices. And he testified that generally, when they talked about sexual acts, he was referring to the future and not necessarily that night.

Pouncy also testified that he did not bring condoms or alcohol when he arrived to the house because he was not planning on having sexual intercourse with "Alexis." And he testified that he did not attempt to kiss Trooper Wilcox on the mouth, but instead, he was trying to kiss her on the cheek.

C. PROPOSED JURY INSTRUCTION ON THE DEFENSE OF ENTRAPMENT AND VERDICTS

Pouncy requested a jury instruction on the defense of entrapment. The trial court found that the record did not provide evidence showing that Pouncy was not inclined to commit the offense or that there was persuasion or efforts by law enforcement to induce or convince Pouncy to commit the crime. The trial court denied Pouncy's request for a jury instruction on entrapment.

The jury found Pouncy guilty as charged. The jury was then presented with evidence regarding Pouncy's prior convictions. After deliberations, the jury found that Pouncy was

11

previously convicted of a felony sex offense in the state of Washington. Because of his prior felony sex offense, the conviction for communication with a minor for immoral purposes was elevated to a felony.

Because Pouncy had previously been convicted of felony sex offenses, the trial court sentenced him as a persistent offender to life in prison without parole.[7] The trial court also ordered that Pouncy not have internet access unless approved by the Department of Corrections and that he could not have contact with minors.

Pouncy appeals.

ANALYSIS

A.    SUFFICIENCY OF THE EVIDENCE

Pouncy argues that there was not sufficient evidence to support the jury's verdicts for attempted second degree rape of a child and communication with a minor for immoral purposes. We disagree.

Evidence is sufficient to support a conviction if any rational trier of fact can find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). The evidence must be viewed in the light most favorable to the State and interpreted most strongly against the defendant. *Id.* Circumstantial and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). A claim of insufficiency of evidence admits the truth of the State's evidence and all inferences that reasonably can be drawn

---

[7] Pouncy was previously convicted of first degree rape and second degree rape.

therefrom. *Salinas*, 119 Wn.2d at 201. We do not review credibility determinations made by the trier of fact. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

      1.      Attempted Second Degree Rape Of A Child

To convict a defendant of attempted second degree rape of a child, the State must prove beyond a reasonable doubt that the defendant took a substantial step toward having "sexual intercourse with another who is at least twelve years old but less than fourteen years old." Former RCW 9A.44.076(1) (1990); RCW 9A.28.020(1). Further, the victim must not be married to the perpetrator and the perpetrator must be at least thirty-six months older than the victim. Former RCW 9A.44.076(1). "Sexual intercourse" has its ordinary meaning. RCW 9A.44.010(1)(a). This includes any penetration of the vagina or anus. RCW 9A.44.010(1)(b). This also includes any act of sexual contact between persons involving the sex organs of one person and the mouth of another. RCW 9A.44.010(1)(c).

A person is guilty of attempting to commit a crime if, "with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1). A substantial step is an act that is strongly corroborative of the actor's criminal purpose. *State v. Aumick*, 126 Wn.2d 422, 427, 894 P.2d 1325 (1995). Mere preparation is not a substantial step. *State v. Workman*, 90 Wn.2d 443, 449, 584 P.2d 382 (1978).

Attempt also requires the specific intent to have sexual intercourse with a child. *State v. Johnson*, 173 Wn.2d 895, 908, 270 P.3d 591 (2012). Where only a fictitious victim exists within the context of a sting operation, the State must show that the defendant knew the perceived victim's age. *Id.* This can be done by proving the perceived victim communicated her age and the defendant received the information. *Id.* The State must then make the same proof that the

13

defendant intended to have sexual intercourse with this victim. *Id.* Factual impossibility is not a defense to a crime of attempt. RCW 9A.28.020(2); *State v. Townsend*, 147 Wn.2d 666, 679, 57 P.3d 255 (2002).

Pouncy argues that the State did not prove that he intended to engage in sexual intercourse with a child. Pouncy claims that he believed "Alexis" was an adult woman who was role playing. But when Pouncy initiated the conversation with "Alexis," "Alexis" immediately revealed that she was 13 years old, and Pouncy acknowledged receipt of this information by responding "That is young." Trial Ex. 3 at 1. Thus, there is substantial evidence that Pouncy knew "Alexis'" was 13 years old. *See Johnson*, 173 Wn.2d at 908.

Pouncy also argues that he only wanted to get to know "Alexis," and therefore, he did not have the required intent to engage in sexual intercourse. He contends that when they talked about sexual acts, he was referring to the future and not necessarily that night, and he points to the fact that he did not bring condoms to the house as proof that he did not actually want to have sexual intercourse.

Here, the State presented evidence that Pouncy asked "Alexis" if she was a virgin. Pouncy also told "Alexis" that she could control the pace. He told "Alexis," "I teach you what I can . . . Slow and easy." Trial Ex. 3 at 6. Pouncy also discussed his plans for engaging in sexual acts during the three phone calls he had with "Alexis." He agreed with "Alexis" when she said it would be bad if she got pregnant and said that he would bring condoms. And when "Alexis" asked if they needed lube, Pouncy assured "Alexis" that the condoms had lube on them. When "Alexis" asked what they were going to do, Pouncy said, "I will go slow. I will taste you, and you will taste me." 1 VRP (Jan. 30, 2020) at 334. He also stated, "[Y]ou will taste my juice, and I will taste

14

yours." 1 VRP (Jan. 30, 2020) at 335. Thus, contrary to Pouncy's argument, substantial evidence exists to show he had the intent to engage in sexual intercourse with "Alexis."

Also, the jury determines credibility. *Camarillo*, 115 Wn.2d at 71. Although Pouncy testified that he did not intend to have sexual intercourse, the jury verdict shows that the jury rejected Pouncy's testimony. We do not review credibility determinations. *Id.*

Pouncy further argues that the State did not prove that he took a substantial step towards having sexual intercourse with "Alexis." Pouncy contends that every act he took was mere preparation.

Here, the State presented evidence that Pouncy drove two hours to a gas station by "Alexis'" house. He then drove to "Alexis'" house once she gave him her address. When "Alexis" opened the door, Pouncy embraced her and attempted to kiss her. Thus, substantial evidence shows that Pouncy took a substantial step towards having sexual intercourse with "Alexis."

Although Pouncy argues that his testimony shows that he simply went to an address given to him by someone he believed was an adult, the jury verdict shows that the jury rejected Pouncy's testimony. We do not review a jury's credibility determinations. *Camarillo*, 115 Wn.2d at 71.

The State presented sufficient evidence for a rational trier of fact to find beyond a reasonable doubt the essential elements of second degree rape of a child beyond a reasonable doubt. Therefore, Pouncy's sufficiency of the evidence challenge on this conviction fails.

2.      Communication With A Minor For Immoral Purposes

A defendant is guilty of a gross misdemeanor if they communicate with a minor, or someone the defendant believes to be a minor, for immoral purposes. RCW 9.68A.090(1). "Communicate" includes conduct as well as words. *State v. Hosier*, 157 Wn.2d 1, 11, 133 P.3d

936 (2006). Further, communication with a minor for immoral purposes requires that the communication be both transmitted and received by the minor or person the defendant believed to be a minor. *Id.* at 9.

"Immoral purpose" refers to sexual misconduct. *Id.* at 11. "The statute prohibits communication with children for the predatory purpose of promoting their exposure to and involvement in sexual misconduct." *State v. McNallie*, 120 Wn.2d 925, 933, 846 P.2d 1358 (1993). This reflects the "legislative concern with adults who exploit children for personal gratification." *Hosier*, 157 Wn.2d at 11.

Pouncy argues that the State did not prove that he believed he was communicating with a minor. Pouncy claims that he believed "Alexis" was an adult engaged in role play.

Here, the text messages and phone calls Pouncy exchanged with "Alexis" show that Pouncy believed he was talking with a 13-year-old girl. Once the text messaging began, "Alexis" revealed her age as 13 years old, and Pouncy acknowledged "Alexis'" age by texting, "That is young." Trial Ex. 3 at 1. During Pouncy's first phone call with "Alexis," he stated that he was "scared this is some Joe Wash s[**]t." 1 VRP (Jan. 30, 2020) at 326. Joe Walsh is the host of the television show America's Most Wanted. Thus, substantial evidence shows that Pouncy knew "Alexis" was a 13-year-old.

Although Pouncy testified that he believed "Alexis" was an adult engaged in role play, the jury verdict shows that the jury rejected Pouncy's testimony as not credible. We do not review a jury's credibility determinations. *Camarillo*, 115 Wn.2d at 71.

We hold that any rational trier of fact could find that the essential elements of communication with a minor for immoral purposes was proved beyond a reasonable doubt. Therefore, Pouncy's sufficiency of the evidence challenge to this conviction fails.

B.      JURY INSTRUCTION ON THE DEFENSE OF ENTRAPMENT

Pouncy argues that the trial court erred when it denied his request to instruct the jury on the defense of entrapment. We disagree.

1.      Legal Principles

We review a trial court's factual determination of whether a jury instruction should be given for an abuse of discretion. *State v. Condon*, 182 Wn.2d 307, 315-16, 343 P.3d 357 (2015). A defendant is entitled to a jury instruction on the defense of entrapment if they establish the defense by a preponderance of the evidence. *State v. Trujillo*, 75 Wn. App. 913, 918, 883 P.2d 329 (1994), *review denied*, 126 Wn.2d 1008 (1995). RCW 9A.16.070 defines the defense of entrapment:

> (1) In any prosecution for a crime, it is a defense that:
> (a) The criminal design originated in the mind of law enforcement officials, or any person acting under their direction, and
> (b) The actor was lured or induced to commit a crime which the actor had not otherwise intended to commit.
> (2) The defense of entrapment is not established by a showing only that law enforcement officials merely afforded the actor an opportunity to commit a crime.

Entrapment is an affirmative defense, and the defendant bears the burden of proving entrapment by a preponderance of the evidence. *State v. Lively*, 130 Wn.2d 1, 13, 921 P.2d 1035 (1996).

"Defendants should ultimately be responsible for demonstrating that they were improperly induced to commit a criminal act which they otherwise would not have committed." *Id.*[8]

The affirmative defense of entrapment "will not be allowed when the evidence indicates merely that the defendant was given an opportunity to commit the crime with which he was charged." *State v. Morgan*, 9 Wn. App. 757, 759, 515 P.2d 829, *review denied*, 83 Wn.2d 1004 (1973). Further, the use of a "normal amount of persuasion to overcome the defendant's expected resistance" is not entrapment. *Trujillo*, 75 Wn. App. at 918. A normal amount of persuasion may include deception, trickery, or artifice. *Id.* It may also include solicitations "'made in connection with an appeal to sympathy or to friendship' does not, by itself, constitute entrapment." *State v. Smith*, 101 Wn.2d 36, 43, 677 P.2d 100 (1984) (quoting *State v. Swain*, 10 Wn. App. 885, 889, 520 P.2d 950, *review denied*, 84 Wn.2d 1004 (1974)). "In order to show entrapment, a defendant must show more than mere reluctance on his or her part to violate the law." *Trujillo*, 75 Wn. App. at 918.

2.    No Evidence Of Entrapment

Pouncy argues that law enforcement initiated the crime. But there is no evidence that law enforcement officers instigated the crime. The officers merely gave Pouncy the opportunity to commit the crime when they created "Alexis'" profile and posted it on a dating app. Pouncy

---

[8] This is significantly different than the burden of proof for entrapment under federal law. As our Supreme Court has recognized, "Under federal common law, the State ultimately has the burden of proving beyond a reasonable doubt that the defendant was 'disposed to commit the criminal act prior to first being approached by Government agents.'" *Lively*, 130 Wn.2d at 13 (quoting *Jacobson v. United States*, 503 U.S. 540, 549, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992)). Due to the different burdens of proof, federal case law addressing whether the State met its burden to prove the absence of entrapment beyond a reasonable doubt has no bearing on whether Pouncy met his burden under Washington law.

himself decided to respond to "Alexis'" profile and was the one who initiated contact with "Alexis."

Pouncy further asserts that he was not predisposed to commit the crimes at hand and was induced to consider illegal acts by pressure from law enforcement. He claims that he was only seeking to connect with a woman, not a child. But, again, there is no evidence that law enforcement officers induced Pouncy to respond to the "Alexis" profile or continue communicating with "Alexis" after he learned she was only 13 years old.

Instead, the evidence shows that Pouncy voluntarily initiated contact with "Alexis" on the dating app. When "Alexis" revealed she was only 13 years old, Pouncy acknowledged that "That is young" and continued to communicate with her, asking her if she had "done this before." Trial Ex. 3 at 1. He asked "Alexis" to send her photographs. After receiving "Alexis'" photographs, Pouncy asked "Alexis" if she was a virgin.

On two occasions, Pouncy said he would no longer talk or meet up with "Alexis," but he resumed communications with "Alexis" with no prompting from "Alexis." On the first occasion he told "Alexis" he would no longer speak with her, she responded with "aww" and a sad face emoji. Trial Ex. 3 at 5. Without any prompting, Pouncy then asked "Alexis" to call him. On the second occasion he told "Alexis" he would no longer speak with her, she texted, "ur bein a jerk." Trial Ex. 3 at 6. Again, without any prompting, Pouncy continued his conversation with "Alexis."

Pouncy fails to show that there was any evidence to support his argument that law enforcement lured or improperly induced him to commit a crime. Instead, the evidence in the record shows that law enforcement merely afforded Pouncy the opportunity to commit a crime.

Thus, there is no evidence to support giving an entrapment instruction, and the trial court did not abuse its discretion by not giving an entrapment instruction.

C.   MOTION TO SUPPRESS ELECTRONIC MESSAGES FOR VIOLATIONS OF THE WPA AND ARTICLE I, SECTION 7 OF THE WASHINGTON CONSTITUTION

Pouncy argues that the trial court erred when it denied his motion to suppress his electronic messages to "Alexis" under the WPA and article I, section 7 of the Washington Constitution. We disagree.

In reviewing the denial of a motion to suppress, we consider whether substantial evidence supports the trial court's findings of fact. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Substantial evidence exists when a fair-minded person is persuaded of the truth of the stated premise. *Id.* We then analyze whether those findings support the trial court's conclusions of law. *Id.* Conclusions of law are reviewed de novo. *State v. Scherf*, 192 Wn.2d 350, 370, 429 P.3d 776 (2018).

1.   Washington Privacy Act

The WPA prohibits an agency from obtaining communications between individuals if a private communication transmitted by a device was recorded or intercepted by a recording or transmittal device without the consent of all parties. Former RCW 9.73.030 (1986); *Townsend*, 147 Wn.2d at 672-73. Private communications include conversations transmitted through telephones, computers, and other devices that are designed to record or transmit communication. Former RCW 9.73.030(1)(a); *Townsend*, 147 Wn.2d at 672. A message is not "intercepted" if the individual sends it directly to a law enforcement officer, regardless of whether the individual

20

believed it was sending the message to that particular person. *State v. Glant*, 13 Wn. App. 2d 356, 366, 465 P.3d 382, *review denied*, 196 Wn.2d 1021 (2020).

Also, law enforcement officers may lawfully record conversations when a person impliedly consents. *Townsend*, 147 Wn.2d at 675-76. A person impliedly consents by choosing to communicate through a device in which the person knows the information will be recorded. *State v. Racus*, 7 Wn. App. 2d 287, 299-300, 433 P.3d 830, *review denied*, 193 Wn.2d 1014, 441 P.3d 828 (2019). When a person sends an electronic message, they do so with the understanding that the message is then available to the receiving party for recording. *Id.* at 299.

Pouncy argues that the trial court erred in its finding of fact 11 because law enforcement violated the WPA when they intercepted his electronic messages. But here, the evidence shows that Pouncy sent the messages directly to "Alexis." It does not matter that Pouncy believed he was sending these messages to "Alexis" rather than directly to Detective Klein. *See Glant*, 13 Wn. App. 2d at 366 (finding no interception where the defendant was text messaging a law enforcement officer personifying the victim). Therefore, substantial evidence supports the trial court's finding that law enforcement did not "intercept" the electronic messages.

Pouncy also argues that the trial court erred in findings of fact 9 and 10 when it found that he voluntarily disclosed information to "Alexis" and impliedly consented to the recording of his communications with "Alexis." But the evidence shows that Pouncy voluntarily chose to communicate with "Alexis," first through the dating app and then over text messaging. Because Pouncy chose to communicate with "Alexis" through such means, "understanding that the messages would be available to the receiving party for recording," he impliedly consented to his communication being recorded. *Glant*, 13 Wn. App. 2d at 365. Therefore, substantial evidence

21

supports the trial court's finding that Pouncy impliedly consented to his communications being recorded.

  2.   Article I, Section 7 of the Washington Constitution

"No person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, §. 7. This provides citizens with protection from government intrusion into their private affairs without legal authority. *State v. Hinton*, 179 Wn.2d 862, 868, 319 P.3d 9 (2014). In deciding whether a violation occurred, we conduct a two-step inquiry. *State v. Athan*, 160 Wn.2d 354, 366, 158 P.3d 27 (2007). First, we ask whether there was a government intrusion into someone's private affairs. *Id.* If there was intrusion, we then ask whether that intrusion was authorized by law. *Id.*

Emails and text messages are private communications. *State v. Roden*, 179 Wn.2d 893, 900, 321 P.3d 1183 (2014). However, when a person voluntarily communicates with a stranger, that person assumes the risk that the conversation will not be confidential. *State v. Goucher*, 124 Wn.2d 778, 786-87, 881 P.2d 210 (1994). A defendant does not have a reasonable expectation of privacy after replying to a stranger's advertisement and then exchanging text messages with that stranger. *Glant*, 13 Wn. App. 2d at 369.

Here, the evidence shows that Pouncy voluntarily responded to "Alexis'" dating profile, then proceeded to exchange text messages with "Alexis." Because Pouncy responded to a stranger's profile on a dating app and then exchanged text messages with that stranger, he did not have a reasonable expectation of privacy in the electronic messages he exchanged with "Alexis." *See Glant*, 13 Wn. App. 2d at 369 (finding the defendant did not have a reasonable expectation of privacy when sending text messages to a stranger and assumed the risk that his conversation would

not be confidential). And because Pouncy did not have a reasonable expectation of privacy in his electronic messages to "Alexis," there was no intrusion into Pouncy's private affairs. Further, because there was no intrusion into Pouncy's private affairs, we not need to analyze whether the intrusion was authorized by law.

We hold that the trial court did not err in denying Pouncy's motion to suppress his electronic messages.

D.      MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT CONDUCT

Pouncy argues that because MECTF engaged in outrageous government misconduct, the trial court erred when it denied his motion to dismiss. We disagree.

1.      Legal Principles

We review a denial of a motion to dismiss based on outrageous government conduct for an abuse of discretion. *Athan*, 160 Wn.2d at 375. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *Id.* at 375-76.

Government conduct is outrageous if it is so shocking that it violates fundamental fairness. *Lively*, 130 Wn.2d at 19. On the other hand, government conduct in the form of deceit or a violation of criminal laws is not outrageous when it is done in order to detect and eliminate crime. *Id.* at 20. Proper law enforcement objectives, preventing crime, and apprehending violators must drive the law enforcement officer's conduct. *Id.* at 21. The trial court reviews claims of outrageous government conduct based on the totality of circumstances. *Id.* at 21. In evaluating the totality of circumstances, we consider several factors, including:

> [1] whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity; [2] whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent

solicitation; [3] whether the government controls the criminal activity or simply allows for the criminal activity to occur; [4] whether the police motive was to prevent crime or protect the public; and [5] whether the government conduct itself amounted to criminal activity or conduct 'repugnant to a sense of justice.'

*Id.* at 22 (citations omitted) (quoting *People v. Isaacson*, 44 N.Y.2d 511, 521, 378 N.E.2d 78, 406 N.Y.S.2d 714 (1978)).

We reviewed the *Lively* factors in a recent decision involving another Net Nanny operation. *See Glant*, 13 Wn. App. 2d at 370. In *Glant*, law enforcement posted an advertisement on Craigslist for a family looking to sexually exploit their children. *Id*. at 361. The defendant, Glant, responded to the advertisement through email, and an MECTF agent, pretending to be the mother who posted the ad, began communicating with Glant. *Id.* Glant then began texting with "the mother." *Id.* The texting included conversations about sexual acts that Glant wanted to perform with the children. *Id.* Glant drove from Mercer Island to Thurston County to meet "the mother," where he was arrested. *Id.*

Glant argued that MECTF engaged in outrageous government conduct because it solicited funding from OUR, a private source. *Id.* at 371. We rejected the argument, concluding that private funding of law enforcement operations is not improper unless the private entity attempts to "overrule or commandeer" the investigations and there was nothing in the record that showed OUR attempted to overrule or commandeer the Net Nanny operations over MECTF's objections. *Id.*

2. No Outrageous Government Conduct

Pouncy makes two arguments regarding outrageous government conduct. First, he argues that the government's conduct was outrageous because MECTF obtained private funding for its Net Nanny operations. Second, he argues that MECTF engaged in outrageous government conduct

under the totality of circumstances. We hold that MECTF did not engage in outrageous government conduct under either theory.

First, Pouncy argues that the government's conduct was outrageous because the MECTF obtained private funding for its Net Nanny operation. However, private funding of law enforcement operations is not improper unless the private entity attempts to overrule or commandeer the investigations. *Glant*, 13 Wn. App. 2d at 371. Here, Pouncy does not identify any evidence that OUR attempted to overrule or commandeer the Net Nanny operation. Because Pouncy does not show that OUR attempted to overrule or commandeer the investigation, he has failed to demonstrate outrageous government conduct.

Second, Pouncy argues that law enforcement officers engaged in outrageous government conduct under the totality of circumstances. As discussed above, we review the totality of circumstances using five factors outlined in *Lively*.

The first *Lively* factor looks to whether police misconduct instigated the crime or infiltrated the ongoing activity. 130 Wn.2d at 22. Posting an advertisement does not instigate a crime when it is posted to the general public and not aimed at a specific individual. *Glant*, 13 Wn. App. 2d at 373.

Here, there is no evidence MECTF instigated the crime because Detective Klein posted "Alexis'" profile to a dating app. Anyone is able to look at and respond to the profile. The record shows that Pouncy voluntarily responded to "Alexis'" profile and continued to communicate with "Alexis" even after he learned that she was 13 years old.

The second *Lively* factor looks to whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation. 130

25

Wn.2d at 22. Pouncy argues that "Alexis" continually pressed for Pouncy to come over to her house and encouraged him to discuss sex acts, even when Pouncy expressed reluctance. But the defendant must show more than just some reluctance. *Glant*, 13 Wn. App. 2d at 373.

Although Pouncy did say at some point during his communications with "Alexis" that he no longer wanted to meet with "Alexis," "Alexis" did not plead with Pouncy, promise anything to Pouncy, or persistently solicit Pouncy. Instead, the evidence shows that on two separate occasions, Pouncy decided to stop talking to "Alexis." Yet, he voluntarily began speaking with "Alexis" again after no prompting. On the first occasion Pouncy texted, "Hey I am not coming." Hearing Ex. 2 at 5. "Alexis" responded with "aww" and a sad face emoji. Hearing Ex. 2 at 5. Six minutes later, Pouncy asked "Alexis" to call him. They continued to text after the phone call ended. On the second occasion, Pouncy texted, "But it feels like you dont want to do anything so I will let you move on." Hearing Ex. 2 at 6. "Alexis" responded, "ur bein a jerk." Hearing Ex. 2 at 6. Pouncy then wrote, without any prompting from "Alexis," "Want me to come over . . . We can do it right now." Hearing Ex. 2 at 6.

Further, the evidence shows that Pouncy repeatedly asked "Alexis" for her address. Pouncy then drove almost two hours to meet up with "Alexis." The fact that a defendant drives a long distance to meet with the persona favors a finding that the defendant was not reluctant. *See Glant*, 13 Wn. App. 2d at 373.

The third *Lively* factor asks whether the government controls the criminal activity or simply allows it to occur. 130 Wn.2d at 22. Pouncy argues that MECTF controlled every detail of the crime. But a defendant controls the criminal activity when they choose to engage with a person they were informed is a child. *See Glant*, 13 Wn. App. 2d at 373-74.

26

Here, law enforcement did not control the criminal activity because Pouncy initiated the conversation with "Alexis" and chose to continue talking with "Alexis" even after learning she was a 13-year-old girl. Further, Pouncy asked "Alexis" on several occasions to send him her address so he could drive to her. Pouncy then decided on his own to drive two hours to meet with "Alexis." And Pouncy was free to stop his conversation with "Alexis" at any point, but instead, he continued to talk with "Alexis" about sexual acts. Therefore, the evidence fails to show that the government controlled every detail of the crime.

The fourth *Lively* factor looks to whether or not the police motive was to prevent crime or protect the public. 130 Wn.2d at 22. Pouncy argues that, even if the agents were motivated to protect the public, they were also motivated by personal monetary compensation that calls into question the overall purpose of the Net Nanny operations.

At the hearing on the motion to dismiss, Sergeant Rodriguez testified that the purpose of the Net Nanny operations was to recover minors who may be exploited for sexual services, arrest people who are exploiting children, and arrest people who are seeking those types of services from minors. He further testified that OUR was not responsible for writing the paychecks for law enforcement officers that participate in the Net Nanny operations. In fact, OUR had no control over any aspect of the Net Nanny operations. There is no evidence that law enforcement was motivated by monetary compensation to call into question MECTF's or law enforcement personnel's purpose in the Net Nanny operation at issue.

The fifth *Lively* factor asks whether the government conduct itself amounted to criminal activity or conduct that is repugnant to the sense of justice. 130 Wn.2d at 22. Pouncy argued that MECTF engaged in criminal activity by offering up fictional children for assault, by recording or

intercepting private conversations without legal authority, and by soliciting donations improperly. This same argument was rejected in *Glant* and is rejected here. *Glant*, 13 Wn. App.2d at 375.

The evidence here shows that law enforcement, by creating fictitious dating profiles, did not engage in conduct repugnant to the sense of justice because using fictitious children in a sting operation is not sufficient to justify dismissal when officers do so in order protect the public and prevent crime against children. *Id.* In addition, as discussed above, the officers did not engage in criminal activity under the WPA. Further, MECTF did not engage in criminal activity when it solicited funding from the OUR because the statute that dictates how funds can be solicited is not a criminal statute. *See* RCW 13.60.110; *Glant*, 13 Wn. App. 2d at 375 (stating RCW 13.60.110 is not a criminal statute). Therefore, Pouncy fails to show that MECTF's conduct itself amounted to criminal activity or conduct that is repugnant to the sense of justice.

The evidence in the record shows that MECTF did not engage in conduct that is so shocking that it violates fundamental fairness and that MECTF's conduct was driven by the goals of preventing crime and apprehending persons who intend to commit sex crimes against minors. The totality of circumstances do not support a finding of outrageous government conduct. Therefore, the trial court did not abuse its discretion by denying Pouncy's motion to dismiss.

CONCLUSION

We hold that (1) sufficient evidence supports Pouncy's convictions, (2) the trial court did not err by not instructing the jury on entrapment because there was no evidence of entrapment, (3) the trial court did not err in denying Pouncy's motion to suppress evidence, and (4) the trial court did not err in denying his motion to dismiss. Therefore, we affirm.

No. 54670-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

                                   Lee, C.J.

We concur:

Worswick, J.

Cruser, J.